Filed 1/24/17; pub. order 2/10/17 (see end of opinion)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BRIAN GERAGHTY,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>JOSEPH SHALIZI,<br><br>　　　Defendant and Respondent. | A144743<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-13-532908) |

Plaintiff and former tenant Brian Geraghty seeks to undo the deal he made with his former landlord, defendant Joseph Shalizi. Shalizi, as the new owner of a four-unit apartment building in San Francisco, could have evicted Geraghty and moved into Geraghty's unit under the owner move-in provisions of San Francisco's rent ordinance. Instead, the two reached an agreement whereby Shalizi would pay $25,000 to Geraghty, and Geraghty, in turn, would vacate the apartment and refrain from suing Shalizi for any claim related to the unit, including any claim under the rent ordinance and any claim premised on a right to reoccupy. Shalizi moved in, but later moved out, and Geraghty sued. Shalizi successfully moved for summary judgment. We reject Geraghty's principal assertion, that his waiver was invalid and unenforceable, and affirm the judgment.

## BACKGROUND

Shalizi was living and working in San Francisco, and renting a studio apartment when, in 2011, he purchased a four-unit apartment building. Three of the units were occupied. Shalizi leased out the vacant one, unit two, to his nephew for $1,100 a month. Shalizi, himself, desired to move into unit four, the unit he thought had the best light and

1

views. Geraghty had been renting unit four for approximately 22 years and was paying $938 a month.

Shalizi's attorney, on March 3, 2011, sent Geraghty a letter informing him of Shalizi's interest in unit four. The letter stated Shalizi intended to commence an owner move-in eviction (termed an Ellis Act[1] "no fault" eviction under the city's rent ordinance), but inquired whether the two might reach a voluntary buyout agreement to their mutual benefit. As Shalizi's lawyer put it, Geraghty would get a greater monetary payment than required (under the city's rent ordinance), Shalizi would avoid "the restrictions resulting" from an owner move-in eviction, and both would save time and stress and the costs of the eviction process. Shalizi and Geragthy eventually entered into an agreement dated May 25, 2011.

The buyout agreement, styled as a court pleading called "Stipulation for Settlement and Entry of Judgment or Dismissal," promised Geraghty $25,000 (Geraghty had initially demanded $100,000) for leaving and gave him several months to depart (Shalizi had initially wanted a faster departure). Paragraph 10 was a release by which Geraghty released Shalizi from "any and all claims which have or may have arisen from Tenant's occupancy of the Premises at any time or any and all claims related to the Premises, including, but not limited to, claims for wrongful eviction, non-compliance with or violations of the provisions of the San Francisco Residential Rent Stabilization and Arbitration Ordinance [SFRRSAO] and Rules and Regulations, . . . [or the] right to reoccupy the Premises."

Geraghty vacated unit four in late July 2011, and Shalizi paid him the promised money. Shalizi then began $70,000 in renovations to prepare the unit for himself and his then-fiancée. He also made arrangements to leave his rented studio, and he and his then-wife moved into the unit in October 2011.

Six months later, Shalizi lost his job. In October 2012, Shalizi found new work, but with a company in the midst of relocating to Santa Clara. On about November 15,

---

[1] Government Code section 7060 et seq.

2012, Shalizi moved to Cupertino to be closer to work and rented unit four to a new tenant for approximately $3,700 a month. Had it not been for the change in jobs, Shalizi avers he would have remained in San Francisco.

Meanwhile, Shalizi had discussions with two other tenants in his building. Sheyanne Johnson recalled a summer 2011 conversation during which Shalizi mentioned Geraghty's departure and the construction that would be taking place in unit four. He then mentioned an interest "in turning [Johnson's] apartment into an owner's unit encompassing the storage units that were below [her] unit." Johnson's unit "was on the first floor, but there was some . . . storage units that [Shalizi] wanted to encompass and turn the whole thing into an owner's unit and use the backyard and everything." Johnson never had the impression Shalizi was trying to force her out, just that Shalizi was seeking an opportunity to make a deal. Upon reflection, Johnson decided she wanted to move anyway, and she proposed a $5,000 payment, which Shalizi accepted.

Wiebke Mueller recalled a conversation with Shalizi in the fall of 2011. Shalizi asked if he was "maybe interested in moving somewhere else in the city, . . . [s]ince [he] was working" some distance from the building. Shalizi mentioned he hoped to do some extensive renovations in the building and it might be easier if Mueller's apartment were vacant. He also said he wanted to move into Mueller's apartment, which Mueller took to mean Shalizi could force him out. Mueller told Shalizi he did not think another "owner move-in" was appropriate given the departures of Geraghty and Johnson, and after some back-and-forth on that subject, the discussion ended.

After discovering Shalizi had moved and was again renting out unit four, Geraghty sued him in July 2013. Geraghty alleged causes of action for violation of the city's rent ordinance, negligence, fraud, and rescission of the buyout agreement.

Shalizi eventually moved for summary judgment. The trial court granted the motion in a one-page order, stating there was no evidence Shalizi "misrepresented his intent to remove [Geraghty] from the premises by way of either buy-out agreement o[r] Owner Move-In Eviction. Owner Move-In eviction has never been initiated due to [Geraghty's] acceptance of the buy-out agreement. No evidence is provided to show that

3

[Geraghty] did not contemplate a possibility of the Owner Move-In Eviction at the time the representation was made. Whether defendant would have followed through with the eviction and whether plaintiff would have complied with the Rent Ordinance is speculative at best and cannot create a triable issue of fact."[2]

## DISCUSSION

On appeal, Geraghty contends the release in the buyout agreement, and particularly the release of any claims under the rent ordinance, is invalid and cannot shield Shalizi from his claims. Geraghty maintains he presented evidence raising a triable issue that Shalizi procured the release by fraud and asserts the buyout agreement should be rescinded.

Since Geraghty alleged a fraud cause of action, he could couple that with a request for rescission, as "a party who is fraudulently induced to execute a contract can either rescind the contract and restore the consideration, or can affirm the contract and recover damages for fraud." (*Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co.* (2010) 50 Cal.4th 913, 923; *Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 234.)

Putting aside that Geraghty has apparently not, in his pleadings, offered to restore to Shalizi the $25,000 he received under their agreement, we turn to the elements of a fraud cause of action that would underlie a request for rescission. " 'The elements of fraud . . . are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' " (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) "An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." (*Ibid.*)

According to Geraghty, Shalizi made the following false representations to induce him into entering the agreement, (1) Shalizi would move into the premises, and (2) Shalizi would do so in accordance with the San Francisco rent ordinance, which, claims

---

[2] There is no reporter's transcript of the summary judgment hearing.

4

Geraghty, requires a landlord to act in good faith, without ulterior reason, and with honest intent. (See S.F. Admin. Code, § 37.9, subd. (a)(8).)

As to the first alleged representation, it was truthful. Shalizi told Geraghty he intended to move in, and Shalizi moved in. (Cf. *Baba v. Board of Supervisors* (2004) 124 Cal.App.4th 504, 518 (*Baba*) [a request to move out is not a false or misleading statement, it is a request].)

As to the second alleged misrepresentation, there is no evidence raising a triable issue that Shalizi made it. True, Shalizi's lawyer told Geraghty that Shalizi intended to proceed with an eviction under the owner move-in provisions of San Francisco Administrative Code, section 37.9, subdivision (a)(8)—but only if a buyout agreement could not be reached. Shalizi and Geraghty, in fact, consummated such an agreement, and, thus, no eviction under and subject to the rent ordinance ever transpired. The letter from Shalizi's lawyer also expressly stated it was Shalizi's intent to be *free* from "the restrictions resulting from an OMI [owner move-in] eviction." And paragraph 10 of the resulting agreement expressly precludes Geraghty from raising non-compliance with or violations of the city's rent ordinance. Geraghty has pointed to no evidence Shalizi represented he would comply with any rent ordinance provisions *as part of their buyout agreement*. Nor does Geraghty point to any evidence he relied on any such representations to his detriment (which he could not, of course, do if no such representations were ever made). In short, the entire premise of the buyout agreement was to *dispense* with rent ordinance provisions in exchange for a significant amount of money. Otherwise, the deal would have been pointless.

Geraghty next maintains the release does not shield Shalizi because it only waives claims that had accrued as of the date of the agreement. However, Geraghty misquotes the release, creating a false impression of what it covers. While he asserts the release provides Shalizi safety from "any and all claims which have or may have arisen from Defendant's occupation of the premises at any time, including but not limited to . . . right to reoccupy the premises," the release, in fact, applies to "any and all claims which have or may have arisen from *Tenant's occupancy* of the Premises at any time *or any and all*

5

*claims related to the Premises*, including, but not limited to, claims for wrongful eviction, non-compliance with or violations of the provisions of the San Francisco Residential Rent Stabilization and Arbitration Ordinance and Rules and Regulations, . . . [or the] right to reoccupy the Premises." (Italics added.) The italicized language, which Geraghty ignores, demonstrates the release covers all claims related to unit four, without time restriction, not only those that have or may have arisen from Geraghty's then soon-to-expire occupancy. Indeed, the plain language of the release unequivocally bars claims asserting a right to reoccupy unit four, which could only arise *after* execution of, and performance under, the agreement.

Finally, Geraghty asserts the release is void to the extent it waives claims under the city's rent ordinance. He relies on section 37.9, subdivision (e), of the ordinance, which provides: "Any waiver by a tenant of rights under this Chapter except as provided in Section 37.10A(g), shall be void as contrary to public policy." (S.F. Admin. Code, § 37.9, subd. (e).)

We examined the application of section 37.9, subdivision (e), in *Kaufman v. Goldman* (2011) 195 Cal.App.4th 734 (*Kaufman*). In that case, a tenant allegedly failed to pay rent and the landlord filed an unlawful detainer action. (*Id*. at pp. 737–738.) As part of a settlement agreement, the landlord agreed to dismiss the unlawful detainer action in exchange for back rent, a portion of the landlord's attorney fees, and a promise to move out after seven years. The tenant acknowledged she was waiving any rights to ongoing possession and waiving rights under the San Francisco rent ordinance. (*Ibid.*) Years later, when the tenant would not vacate, the landlord sued to enforce the settlement agreement. (*Id.* at pp. 738–739.)

In affirming summary judgment for the landlord, we concluded section 37.9, subdivision (e), did not apply. (*Kaufman*, *supra*, 195 Cal.App.4th at pp. 744–745.) "While SFRRSAO section 37.9, subdivision (e) purports to void any waiver by a tenant of rights under the ordinance in the context of an eviction or an owner move-in, the waiver language does not apply to the settlement of a legal claim that was made for valuable consideration in return for termination of litigation. Parties frequently settle

landlord-tenant disputes, and move-out provisions are not uncommon. If SFRRSAO section 37.9, subdivision (e) were deemed to apply to such move-out provisions, this would have a chilling effect on future settlements of unlawful detainer actions as landlords would have little incentive to enter into prelitigation negotiations." (*Id.* at p. 745, fn. omitted.)

In the instant case, litigation did not actually commence. However, Shalizi made clear he intended to institute legal action to recover Geraghty's unit if the parties were unable to reach a negotiated agreement. For the same reasons expressed in *Kaufman*, we conclude the parties should be held to the terms of their negotiated disposition, which afforded benefits to both and avoided burdening the court with a lawsuit.

Furthermore, the history of section 37.9, subdivision (e), does not support Geraghty's claim that it prohibits a waiver of rights in a negotiated buyout agreement.

Prior to 2002, section 37.9, subdivision (e), did not refer to section 37.10A, subdivision (g), and simply stated "any waiver by a tenant of rights under this Chapter" was void, citing no exception. (S.F. Ord. No. 57-02, File No. 011575; S.F. Ord. No. 23-02, File No. 020153.)

That year, the city's board of supervisors acted on concerns that "tenants who *were not represented by counsel* had been subjected to owner move-in or Ellis Act evictions and had waived their rights under the Rent Ordinance, purported to release landlords from their obligations under the Ordinance and/or agreed not to cooperate with the district attorney or the Rent Board." (*Baba*, *supra*, 124 Cal.App.4th at p. 510, italics added.) The board amended both section 37.9, subdivision (e), and section 37.10A, subdivision (g).

Under amended section 37.10A, subdivision (g), a waiver of ordinance-conferred rights could occur only when: "[T]he tenant is represented by independent counsel and the waiver is approved in a Court-supervised settlement agreement, or by a retired judge of the California Superior Court sitting as a mediator or arbitrator by mutual agreement of the tenant represented by independent counsel and the landlord. Any settlement agreement shall identify the judge, mediator, or arbitrator reviewing the settlement, all

7

counsel representing the parties, and any other information as required by the Board. The landlord shall file a signed copy of the settlement agreement with the Board within ten days of execution. Unless otherwise required by the Board, the copy of the agreement filed with the Board shall redact the amount of payments to be made to tenants." (S.F. Admin. Code, § 37.10A, subd. (g).) Section 37.9, subdivision (e), was concomitantly amended to state waivers were void as contrary to public policy if not made in accordance with amended section 37.10A, subdivision (g). (*Id*., § 37.9, subd. (e).)

Significantly, these amendments were not presented as permitting buyout agreements for the first time. Rather, the amendments were presented as affording protections for unrepresented tenants and putting into place procedural limitations requiring that tenants have independent counsel. (S.F. Ord. No. 57-02, File No. 011575, pp. 17–18.) Had section 37.9, subdivision (e), previously barred these agreements all together, the amendments adding procedural restrictions in the name of protecting unrepresented tenants would have made no sense.

In the wake of these amendments, two San Francisco tenants, a city landlord, and two city-based lawyers sued to invalidate portions of them, including section 37.10A, subdivision (g). (*Baba*, *supra*, 124 Cal.App.4th at p. 511.) They succeeded, and the Court of Appeal affirmed an injunction prohibiting enforcement of section 37.10A, subdivision (g), and its procedural requirements for waivers. (*Baba*, at pp. 512, 527–528.) "The waiver restrictions of section 37.10A(g)" were adjudged "inimical to the state right to represent oneself in a civil proceeding. These restrictions require that a tenant participate in a legal proceeding in order to waive his rights under the Rent Ordinance and simultaneously deny that tenant the right to represent himself at that proceeding. These restrictions are imposed without regard to their effect on basic rights, at least ones with constitutional implications. Because the waiver restrictions of section 37.10A(g) conflict with general law, this part of the provision is invalid." (*Id.* at pp. 526–527.) "[S]o too" was the other "part of the provision which purports to criminalize efforts to

8

obtain a waiver that does not comply with the invalid waiver restrictions."[3] (*Id.* at p. 527.)  While *Baba* invalidated section 37.10A, subdivision (g), it made no mention of section 37.9, subdivision (e), which continued to provide: "Any waiver by a tenant of rights under this Chapter except as provided in [now invalidated] Section 37.10A(g), shall be void as contrary to public policy." (S.F. Amin. Code, § 37.9, subd. (e).)

In 2014, three years after *Kaufman* concluded section 37.9, subdivision (e) does not prohibit landlords and tenants from reaching an agreement to resolve litigation, the city again addressed landlord-tenant agreements and dealt explicitly with buyout agreements.  The resulting October 2014 ordinance, which took effect in 2015, includes a summary of the conditions that spurred the city to action: "Instead of evicting tenants, some landlords offer cash buyouts to tenants in exchange for the tenants vacating rental units.  These are sometimes called buyout agreements. Even buyouts worth tens of thousands of dollars can be recouped by a landlord retaining ownership and re-renting at market rates or selling the unit.  Unlike no-fault evictions, *these buyouts are unregulated, and can enable landlords to circumvent many of the restrictions that apply when a landlord executes a no-fault eviction*.  For example, a landlord who executes some types of no-fault evictions must give tenants a certain amount of time to move out, provide funds to tenants to cover relocation costs, and allow tenants to move back into the unit under specified circumstances.  Two types of these no fault evictions—the Ellis Act and owner move-in evictions—contain restrictions on how much rent a landlord can charge if the units are re-rented following eviction.  Analogous regulations do not exist for tenant buyouts." (S.F. Admin. Code, § 37.9E, subd. (a), italics added; S.F. Ord. No. 225-14, File No. 140874, p. 2.)

---

[3] In a footnote, the appellate court noted it had "not been asked to determine whether the [city Rent] Board has the power to prohibit waivers altogether" but noted, in any case, "assuming the Board has such power, it is not free to abuse that power by imposing conditions that violate the law." (*Baba*, *supra*, 124 Cal.App.4th at p. 522, fn. 4.)

An earlier July 2014 report of the Budget and Legislative Analyst's Office, likewise, concluded buyouts were "not subject to regulation by the City and County of San Francisco" and "can be cost-effective for landlords compared to No-Fault evictions." (San Francisco Bd. Supervisors, Budget and Leg. Analyst, Policy Analysis Rep. (July 29, 2014) p. 1 [tenant buyouts].) The report analyzed some 688 buyout offers between 2008 and 2014 reported to the San Francisco Tenants Union, alone, and thus did not reflect the additional, and presumably significant number of, buyouts taking place without the Tenants Union's involvement. (See *id.* at pp. 7–8 & fn. 9.)[4]

Thus, when the city addressed buyout agreements in late 2014, those agreements were, in the city's view, (1) occurring regularly as part of the ordinary give and take of the rental market, and (2) not subject to current regulations.

Rather than outlawing buyout agreements as pernicious to its rent ordinance, and rather than touting the new regulation as an accommodation to landlords previously acting unlawfully, the city's 2014 ordinance, as did the 2002 ordinance, recognized the existence of such agreements and set forth a host of procedures to be followed when a landlord and tenant wish to negotiate one. (S.F. Admin. Code, § 37.9E.) Indeed, "[t]he main purpose of this Section 37.9E is to *increase the fairness of buyout negotiations and agreements* by requiring landlords to provide tenants with a statement of their rights and allowing tenants to rescind a buyout agreement for up to 45 days after signing the agreement, thus reducing the likelihood of landlords pressuring tenants into signing buyout agreements without allowing the tenants sufficient time to consult with a tenants' rights specialist. Another goal of this ordinance is to help the City collect data about buyout agreements. The City lacks comprehensive information about the number, location, and terms of buyout agreements. This dearth of information precludes the City

---

[4] After notifying the parties of our intent, we take judicial notice of this report on our own motion as it provides supplemental context for the city's legislative action. (See Evid. Code, §§ 452, 459; *New Cingular Wireless PCS, LLC v. Public Utilities Com.* (2016) 246 Cal.App.4th 784, 798, 803 & fn. 16 (*New Cingular*); *Building Industry Assn. of Bay Area v. City of San Ramon* (2016) 4 Cal.App.5th 62, 70, fn. 5.)

from understanding the true level of tenant displacement in San Francisco." (S.F. Admin. Code, § 37.9E, subd. (a), italics added.)[5]

Even after these 2014 amendments, section 37.9, subdivision (e), and its reference to long invalidated section 37.10A, subdivision (g), remains unchanged.

Looking at the history of the city's legislation concerning landlord-tenant buyout agreements and the case law concerning these agreements, the conclusion is inescapable that these agreements have been utilized and honored for decades. The city has plainly taken this view of its rent ordinance. And the board of supervisor's summaries of existing law, when combined with the then-current practices of those in the rental market, is persuasive evidence of what the existing law was. (See *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 195; *Eu v. Chacon* (1976) 16 Cal.3d 465, 470; *New Cingular, supra*, 246 Cal.App.4th at pp. 798, 803 & fn. 16 [for "confirmation of the legislative intent, we may look to the pertinent statutory history and the wider circumstances of . . . enactment," including relevant reports of public agencies].)

Further, "As a general proposition the courts have held that ' "The very fact that [a] prior act is amended demonstrates the intent to change the pre-existing law . . . ." ' [Citations.] Although a legislative expression of the intent of an earlier act is not binding upon the courts in their construction of the prior act, that expression may properly be considered together with other factors in arriving at the true legislative intent existing when the prior act was passed." (*Eu, supra*, 16 Cal.3d at p. 470; cf. *Peralta Community College Dist. v. Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 52 ["[t]he declaration of a later Legislature is of little weight in determining the relevant intent of the Legislature that enacted the law . . . when . . . such declared intent is without objective support in either the language or history of the legislation and (until recently) is contrary as well to the practice of the affected agency"].)

---

[5] The parties agree the 2014 ordinance does not govern this case, directly, as they entered into their buyout agreement in 2011. Accordingly, their agreement was not required to meet the procedural requirements of the 2014 ordinance.

We therefore reject Geraghty's assertion that, as of 2011, when he negotiated a buyout agreement with Shalizi, he could not validly release any and all claims under the rent ordinance.[6]  Because the release extends to all of Geraghty's causes of action, the trial court properly granted summary judgment to Shalizi.

### DISPOSITION

The judgment is affirmed.

---

[6]  While Geraghty asks what could section 37.9, subdivision (e), have meant if it did not apply to a negotiated buyout, it meant at the very least that a landlord could not, in a rental or lease agreement, require a tenant to waive provisions of the rent ordinance.

_____
Banke, J.

We concur:


_____
Humes, P.J.


_____
Dondero, J.

Filed 2/10/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BRIAN GERAGHTY,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>JOSEPH SHALIZI,<br><br>     Defendant and Respondent. | A144743<br><br> (San Francisco City & County<br> Super. Ct. No. CGC-13-532908)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

The opinion in the above-entitled matter filed on January 24, 2017, was not certified for publication in the Official Reports. After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

Dated:

_____
Humes, P.J.

14

Trial Court:   San Francisco City and County Superior Court

Trial Judge:   Hon. Lillian K. Sing

Counsel:

Law Offices of Robert De Vries, Robert De Vries for Plaintiff and Appellant.

Dunn & Panagotacos, LLP, Ryan T. Dunn; Hayes, Scott, Bonino, Ellingson & McLay, LLP, Mark G. Bonino and Gabrielle A. Hollingsworth for Defendant and Respondent.