IN RE: FCA US LLC MONOSTABLE ELECTRONIC GEARSHIFT LITIGATION

Case Number 16–md–02744 MDL No. 2744

United States District Court, E.D. Michigan, Southern Division.

Signed November 15, 2017

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS ALLEGING FAILURE TO STATE A CLAIM

DAVID M. LAWSON, United States District Judge

This is the third motion to dismiss filed by the defendant under Federal Rule of Civil Procedure 12(b) aimed at the first amended consolidated master class action complaint (FACMC) in this multidistrict litigation proceeding. The first two motions challenged subject matter and personal jurisdiction under Rules 12(b)(1) and (2), respectively. The present motion is based on Rule 12(b)(6), but it adopts the same reading of the FACMC that the Court rejected earlier as unfaithful to the plain text of that pleading. The motion here is necessarily more complex, however, because it addresses a complaint that alleges 86 counts under the laws of 18 states (although claims under only seven states' laws are currently live), plus a federal count under the Magnuson–Moss Warranty Act. Although the laws of some of the states interpose certain procedural obligations that a few of the plaintiffs failed to meet—necessitating dismissal of some counts—the faulty premise rejected by the Court in its previous opinion on the Rule 12(b)(1) motion dooms the defendant's principal arguments here, and therefore the Court will deny, for the most part, the motion to dismiss alleging failure to state a claim.

I. Facts and Proceedings

A. Summary of Pending Claims

This multidistrict case began with an October 5, 2016 order of the Judicial Panel on Multidistrict Litigation (JPML). The proceeding presently comprises 23 cases

transferred or consolidated before this Court, from 17 districts including the Eastern District of Michigan. Eleven of those cases involve claims for economic losses only, and 12 include allegations of personal injuries resulting from "rollaway" accidents.

The FACMC, [dkt. # 88], which was filed on March 24, 2017, collected the claims of 29 individual plaintiffs from 18 states. Since the FACMC was filed, some of the plaintiffs have dropped out and a few of the personal injury cases have settled. Claims for economic loss by 35 plaintiffs subsequently were transferred to or directly filed in this Court, and therefore have not yet been consolidated in the master pleading and are not directly subject to the present motion to dismiss. Nonetheless, the counts of the FACMC are representative of the claims in the more recent cases, and the defendant's arguments as to those actions likely would be the same.

The FACMC, as filed, sets forth 86 counts for violations of the federal Magnuson–Moss Warranty Act, 15 U.S.C. § 2301 et seq., and for breaches of express and implied warranties, false or deceptive advertising, fraudulent concealment, and unjust enrichment, under the common law and consumer protection statutes of the various states. However, after the consolidated complaint was filed, the Court dismissed without prejudice the claims of 20 plaintiffs from several states who were named in a case transferred here from the Central District of California (the *Goldsmith* case, No. 16–13681 (E.D. Mich.) (a.k.a. *Goldsmith v. FCA US, LLC*, No. 16–01341 (C.D. Cal.); f/k/a *Andollo v. FCA US, LLC*). Those 20 non-California plaintiffs have re-asserted their claims in other civil actions presently before the Court, but not before the defendant's Rule 12(b)(6) motion was argued. Therefore, as the plaintiffs note in their response to the motion to dismiss, after the dismissal of

those 20 plaintiffs, the surviving claims pleaded in the consolidated master complaint involve only 11 plaintiffs from seven states:

- California (David Goldsmith, Michael Vincent Nathan, Jr., and Pascual Pietri) (Counts VI–XII)

- Massachusetts (Bernadine Hartt) (Counts XXI–XXIII)

- Missouri (Taylor Brooks) (Counts XXIX–XXXIII)

- Nebraska (Nina Walker) (Counts XXXIV–XXXVIII)

- New York (John Lynd and Janella Mack) (Counts XLIX–LIII)

- Pennsylvania (Timothy Weber and Bruce Vosburgh) (Counts LXVIII–LXXII)

- Wisconsin (Marc Hughes) (LXXXII–LXXXVI)

The separately filed consolidated personal injury complaint [dkt. # 74] asserted consolidated claims on behalf of 12 personal injury plaintiffs (five remain). Since that consolidated complaint was filed, nine more plaintiffs' cases have been transferred to this Court.

### B. Factual Background

This case concerns alleged design defects in certain cars made by defendant FCA US, LLC (commonly referred to as Fiat Chrysler Automotive, or FCA) between 2012 and 2015. The FACMC alleges the various liability theories noted above on behalf of the named plaintiffs and all other persons in the United States "who purchased, leased or own a 2012–2014 Chrysler 300, 2012–2014 Dodge Charger, or 2014–2015 Jeep Grand Cherokee equipped with a monostable electronic gearshift supplied by ZF Friedrichshaffen AG" (the so-called "monostable shifter" or "defective shifter"). This shifter design does not use a lever that moves physically to different positions, but instead is pushed

in a direction by the driver, and then springs back to its original position after a gear is selected. The only indication that the car has changed gears or is in a particular gear is from lighted indicators on the dashboard and shifter that change to display letters such as "D" for "Drive" or "P" for "Park." Unlike some other vehicles with similar gearshift designs made by FCA's competitors, the cars at issue in this lawsuit also do not have any mechanism to automatically shift the car to "Park" when the driver exits the car while it is in another gear.

As noted above, the defendant has recycled its arguments from the Rule 12(b)(1) motion based on its view that the plaintiffs claim that the vehicles are defective *only* because they do not include an auto-park feature—which was neither promised nor paid for—and little more. That assertion misrepresents the substance of the FACMC. To assess the defendant's Rule 12(b)(6) motion, it is necessary to review the pleading in some detail.

### 1. Design Defects

The plaintiffs allege that the monostable shifter design is defective and unsafe in two ways: (1) it gives insufficient indications to a driver about whether an intended gear selection was completed, and what gear the car is in; and (2) it can cause the car to shift into a gear other than the one that was selected, or to shift spontaneously out of "Park" and into a gear that allows the car to move. The plaintiffs assert that the danger posed by those defects is aggravated by the fact that the cars do not have any safety override or auto-park feature to automatically shift the transmission to "Park" if the driver side door is opened when the engine is running.

As stated in the FACMC, "the lack of a physical gear level for PRND and the Defective Shifter's return to its predetermined location has led to hundreds of reports of Class Vehicles rolling away when

drivers thought their vehicles were in Park." The defendant acknowledged in its own recall notices the risk that, because "[g]ear-selection is conveyed to the driver by ... indicator lights, not gear-selector position ... drivers may draw erroneous conclusions about the status of their vehicles." FACMC ¶¶ 119–20. The plaintiffs assert that "[t]he Defective Shifter's use of solely visual cues to alert drivers to the Class Vehicles' gear position is ineffective because drivers may not realize that they have not pushed the gear lever forward or backward enough to engage their desired gear." They say that "[b]ecause there is no tactile feedback informing a driver whether the shifter lever has physically moved and is resting in P, R, N or D, drivers may think they have pushed the shifter lever forward enough to engage the Park gear and may exit the vehicle when it is not actually in Park." *Id.* ¶ 124. They also allege that "[t]he Defective Shifter's sole reliance on visual feedback to convey gear selection has been dangerously ineffective." And they allege that the defendant knew as much because "consumer complaints beginning at least as early as 2013 ... document Class Vehicle owners' and lessees' inability to determine whether their vehicle is in the desired gear resulting in hundreds of rollaways, accidents and injuries." *Id.* ¶ 125. The plaintiffs further assert that "numerous complaints to [the National Highway Transportation Safety Administration (NHTSA)] allege that once a driver puts a Class Vehicle into Park, the vehicle can move into another gear on its own." *Ibid.*

The plaintiffs allege that "[u]nlike other automobile manufacturers, FCA did not implement a safety override feature that would prevent Class Vehicles from moving when the vehicles are not in Park and a driver opens the driver door and disengages pressure on the gas or brake pedals to exit the vehicle." "The lack of a fail-safe

feature is especially problematic because the engine stop button in the Class Vehicles is programmed to not function when drivers attempt to shut off the engine while the vehicle is not in Park." FACMC ¶¶ 121, 126.

The potential problems that this combination of features could cause were summarized by NHTSA in a report that followed its investigation of the rollaway incidents:

The Office of Defects Investigation (ODI) opened Preliminary Evaluation PE15–030 on August 30, 2015 to investigate 14 complaints alleging incidents of rollaway after intended shifts to Park in Model Year (MY) 2014 and 2015 Jeep Grand Cherokee vehicles. The MY 2014–2015 Grand Cherokee vehicles are equipped with Monostable electronic ("E-shift") gearshift assemblies supplied by ZF Group (ZF). The E-shift system operates electronically and the gear requested by the driver is transmitted from the shifter via the CAN Bus to the Transmission Control Module which makes the requested shift. The Monostable gearshift does not move into a detent but springs back to a centered / neutral position after the driver selects a gear and releases the shifter. A button on the shift knob must be depressed to shift out of Park, shift out of Neutral, and to shift from Drive to Reverse or Park.

The gear selected is shown on a display in the dash and illuminated letters on the shifter. If the driver's door is opened when the gearshift is not in Park, a chime sounds and a message is displayed on the [Electronic Vehicle Information Center (EVIC)] to warn the driver. In addition, the engine Start / Stop push-button control logic does not permit normal engine shut-off when the transmission is not in Park. This logic may provide feedback to drivers who attempt to turn the engine off when the transmission is not in Park. However, this function does not protect drivers who intentionally leave the engine running or drivers who do not recognize that the engine continues to run after an attempted shut-off.

NHTSA testing during PE15–030 indicates that operation of the Monostable shifter is not intuitive and provides poor tactile and visual feedback to the driver, increasing the potential for unintended gear selection.

FACMC, Ex. A, NHTSA Report (Initial) (Pg ID 2953–54). The FACMC incorporates NHTSA's final analysis of the shifter design and its relation to the mishaps disclosed by its own investigation and the manufacturer's defect report to the agency, which reads:

Although the Monostable gearshift has the familiar appearance of a conventional console mechanical gearshift assembly, it has unfamiliar movement that does not provide the tactile or visual feedback that drivers are accustomed to receiving from conventional shifters. Consequently, the driver must take additional time to verify that the desired gear position was achieved by checking the PRNDL display on the shift knob or the Electronic Vehicle Information Center (EVIC) display.

FCA received negative consumer feedback for the Monostable shifters shortly after the subject vehicles entered the market. Field data indicates that the design resulted in higher error rates during attempted shifts to Park and higher rates of powered rollaway incidents. The Monostable design appears to violate several basic design guidelines for vehicle controls such as: 1) be consistent; 2) controls and displays should function the way people expect them to function; 3) minimize what the user has to remember; and 4) operations that

occur most often or have the greatest impact on driving safety should be the easiest to perform. FCA changed to Polystable electronic gearshift assemblies in MY 2015 Charger / 300 cars and MY 2016 Grand Cherokee vehicles. The Polystable gearshift assemblies stay in the position of the selected gear, similar to a standard mechanical shifter, providing drivers with the expected tactile and visual feedback (i.e., works as expected and does not require additional thought or attention).

FACMC, Ex. B, NHTSA Report (Final) (Pg ID 2956–57).

### 2. Rollaway Incidents

Four of the individual plaintiffs allege that they had rollaway incidents with their own cars: Goldsmith, Nathan, Brooks, and Mack. Four others allege that they have had problems shifting the car into an intended gear: Hartt, Lynd, Weber, Vosburgh. FACMC ¶¶ 36, 38, 56, 75, 79. Two plaintiffs, Nathan and Lynd, alleged that, as a result of the unreliable gear shifter, they no longer feel safe driving their cars. FACMC ¶ 38, 73.

Missouri plaintiff Taylor Brooks alleged that he bought his "certified pre-owned" 2015 Jeep Grand Cherokee on May 28, 2016. He was not informed by the dealer or the defendant about any recall. When he later learned about the recall on his own, he called the dealer to inquire if his car was safe, and the dealer told him the recall issue had been fixed. On July 11, 2016, Brooks tried to put his car in "Park" at a gas station, but the "Park" setting did not engage, and the car rolled away across four lanes of traffic, eventually crashing into a fence. Brooks later learned, after checking the VIN on his car, that no recall repair had been done, and the initial recall he had learned about was "educational" only. The dealer told Brooks that he would have to seek coverage from his insurer for the damage to his car. FACMC ¶¶ 55–59.

New York plaintiff John Lynd alleged that, before the recall, he had "multiple instances" where he tried to place his car in "Park" and realized as he was about to exit the vehicle that it actually was in "Drive" or "Reverse" instead. He took his car to the dealer for a recall-related software fix to be applied, but, since the fix was installed, he has more than once tried to put the car in "Park" using the shifter, "only to watch the transmission shift instead to a different gear." FACMC ¶¶ 66–72.

New York plaintiff Janella Mack alleged that she put her car in "Park" and got out to unload it while it was in the driveway of her grandmother's home. However, as she was unloading items, the car rolled away and was damaged. FACMC ¶ 75.

Pennsylvania plaintiff Timothy Weber alleged that he has had incidents where he tried to put his car in "Park" and thought that it was in "Park," only to discover when he tried to exit the car that it was in "Reverse" instead. FACMC ¶ 87.

The FACMC also catalogs 15 examples of reports to NHTSA by owners of class vehicles, logged between April 2013 and May 2016, of incidents where a driver shifted the car into "Park," and the car appeared to be in "Park," but after the driver exited the car it rolled away under its own power. FACMC ¶ 146 (Pg ID 2671–84). In several incidents the drivers reported that the gear selected indicator clearly "showed the vehicle to be in Park," but the car nevertheless was in another gear, or shifted to another gear after the driver got out. Several others reported that when the driver attempted to place the car in "Park" using the shift lever, it instead shifted to "Drive" or "Reverse." Others reported instances in which they selected an intended gear with the shifter such as "Park" or "Drive," but the car instead shifted into another gear such as

"Reverse," "Neutral," or "Low." In some cases drivers even attempted to shut off the engine before exiting the car, but because the vehicle was not in "Park," and without the driver realizing it, the engine did not turn off, and the driver did not perceive that the engine was running and the transmission was in a travel gear, due to the car's inaudibly low engine noise at idle.

NHTSA investigated the alleged shifter defect between August 2015 and February 2016, and its investigation "identified 306 incidents of vehicle rollaway following intended shifts to Park in the 2014–2015 Grand Cherokee." FACMC ¶¶ 149, 154. NHTSA's "analysis of these incidents determined that [they] resulted in 117 alleged crashes," and that 28 of the crashes resulted in serious injuries, with other incidents resulting in minor injuries. *Id.* ¶ 154. On April 22, 2016, FCA submitted a "defect information report" to NHTSA "regarding a defect that could result in unattended vehicle rollaway with the engine running in model year (MY) 2012 to 2014 Dodge Charger and Chrysler 300 vehicles and MY 2014 to 2015 Jeep Grand Cherokee vehicles equipped with 8–speed transmissions and a monostable gear selector." FACMC, Ex. A, NHTSA Report (Pg ID 2956). NHTSA's analysis of the defect report indicates that its own investigation and the manufacturer's defect report disclosed a combined total of 686 reports of rollaway incidents, resulting in 286 crashes, and 68 of those incidents produced injuries. *Ibid.*

### 3. Voluntary Recall

The plaintiffs allege that FCA knew about the defects in the shifter since at least 2011, when the affected vehicles first went to market, but it took no steps to address the defect until it issued a voluntary recall in April 2016. In May 2016, FCA sent affected owners a letter explaining the problems and risks with the shifter design, but that letter stated only that FCA was working on a solution to be released near the end of 2016. The NHTSA report of the voluntary recall stated that FCA had assessed the defect and risks that led to the recall. It read:

> Drivers erroneously concluding that their vehicle's transmission is in the PARK position may be struck by the vehicle and injured if they attempt to get out of the vehicle while the engine is running and the parking brake is not engaged. FCA US has therefore determined that the absence of an additional mechanism to mitigate the effects of driver error in failing to shift the monostable gear selector into PARK prior to exiting the vehicle constitutes a defect presenting a risk to motor vehicle safety.

FACMC, Ex. F, Recall Report dated May 24, 2016 (Pg ID 2971). The plaintiffs assert that in the meantime, because there was no remedy immediately available to fix the defect, they were left with the alternatives of either driving a dangerous vehicle, or not driving their cars at all. The recall notice ultimately affected more than 800,000 vehicles in the United States. FCA also later phased out the problematic shifter design starting with the 2016 model year.

According to the FACMC, on June 20, 2016, the problems with the shifter design became a subject of widespread public attention when news sources "reported that a young Hollywood actor, Anton Yelchin, was crushed to death when his 2015 Jeep Grand Cherokee rolled backward down his driveway and pinned him against his mailbox after he exited the vehicle." FACMC ¶ 17.

On June 24, 2016, FCA notified owners of certain affected vehicles that they could bring their cars to an FCA dealer for a software update that would add an "auto

park" feature, intended to "eliminate[ ] the possibility of the driver inadvertently failing to place the transmission into 'PARK' prior to exiting the vehicle." FACMC ¶ 19. However, the plaintiffs contend that the software fix was ineffective, and there have been numerous reports logged by NHTSA of vehicles having rollaway accidents after the fix was applied. Some owners have had to return to their dealers for a second purported fix, which also has not fully remedied the defect. According to published news reports, FCA has acknowledged that the fix was ineffective when applied to up to 13,000 affected vehicles in the U.S., and it has sent a second recall notice to affected owners directing them to return their vehicles to a dealer for further repairs. *Id.* ¶ 22.

### 4. Economic Losses

The plaintiffs allege that they have suffered losses in several ways as a result of the defect, the widespread reports of accidents caused by it, and the defendant's attempts to fix it. They contend that they overpaid for cars they thought were safe, which were not; had to take time off from work and other obligations to accommodate the defendant's failed attempts to fix their cars; and now own vehicles that have dropped in value much faster than previous similar models or competitor vehicles, due to the public perception that the cars are dangerous to own and drive. The plaintiffs allege as an example that, before new reports about the defective shifter surfaced, "2014 and 2015 Jeep Grand Cherokees held their value *better* than other cars in their class," but "after the defect stories became known, the monthly depreciation of these cars increased drastically, causing them to hold value worse than other cars in their class." FACMC ¶ 12.

Seven of the plaintiffs specifically allege that they bought and still own their class vehicles: Goldsmith, Hartt, Brooks, Mack, Weber, Vosburgh, and Hughes. Two plaintiffs, Nathan and Pietri, allege that they bought class vehicles, but do not specifically allege that they still own them (however, they also do not allege that they have sold or disposed of the cars). New York plaintiff John Lynd alleged that he leased a class vehicle, and the term of his lease has not ended. Nebraska plaintiff Nina Walker alleges that she leased a 2014 Dodge Charger, but decided not to purchase the car at the end of the lease term. However, during the term of the lease, Walker "had her vehicle repaired" by the dealer she leased it from. FACMC ¶¶ 60–61.

### 5. Product Advertising

The plaintiffs quote samples of the defendant's advertising materials, from print and internet sources, including claims that "[t]o ensure that FCA vehicles deliver maximum safety and quality to customers over their entire life, every mechanical and electronic component, body part and trim element is rigorously tested," and that its car "designers work with a team of researchers during the testing phase to ensure vehicles meet the highest standards in terms of safety, ecological profile, driving performance and quality." FACMC ¶ 133. Advertising literature for the Dodge Charger states that "safety and security is a priority," "safety and security are built in," the "Dodge Charger is helping keep you and your passengers safe and secure," the vehicle is "always on guard," and "the Dodge Charger packs more than 80 standard and available safety and security features to help keep drivers and passengers protected." FACMC ¶ 134. Similar promotional messages for the Chrysler 300 and Jeep Grand Cherokee state that "[t]he Chrysler 300 Offers Over 80 Standard and Available Safety and Security Features," and the Cherokee has "[o]ver 70 available safety and security features," with "protection when and where you need it." Marketing materials for the Cherokee also pro-

mote it as being "[a]t the forefront of the latest safety and security systems," and "[s]afe, secure, and in control." FACMC ¶¶ 135, 137. None of the cited literature describes any feature of the vehicles' gear shifter design.

All of the individual plaintiffs allege that they bought or leased their cars because of their reputation for safety and reliability, and that they were persuaded to do so by the defendant's advertising about the cars' safety features. The plaintiffs also believed that their cars would be a good value because of that reputation. The plaintiffs also all assert that, before the defendant issued its recall notice on April 22, 2016, they did not know that the shifter design in the cars was defective and dangerous, that the design had caused numerous reported rollaway incidents, or that some of those incidents had produced serious injuries. They assert that they were not notified by either the defendant or the dealers who sold or leased them the vehicles that their cars were subject to any recall notice or defect investigation, and that they only later learned about the recall. Five plaintiffs specifically allege that they bought or leased their cars before the April 22, 2016 recall notice was issued: Goldsmith, Nathan, Lynd, Weber, and Vosburgh. Two plaintiffs, Pietri and Brooks, specifically allege that they bought or leased their vehicles after the notice was issued (both in May 2016). Four plaintiffs do not specifically allege the date when they bought or leased their cars: Hartt, Walker, Mack, and Hughes.

### 6. Limited Warranty

The defendant attached to its motion to dismiss copies of several new vehicle warranty documents covering the various class vehicles. *E.g.*, Def.'s Mot., Ex. B, 2014 Chrysler All Vehicles Basic Limited Warranty (Pg ID 3284). All versions of the warranty have substantially identical terms and offer "Basic Limited Warranty"

coverage of the entire vehicle for three years or 36,000 miles (3/36), and "Powertrain Limited Warranty" coverage for five years or 100,000 miles (5/100). *Id.* at 1 ("Warranty Coverage"). The warranty documents all state that "[t]he warranties contained in this booklet are the only express warranties that [FCA] makes for your vehicle," and that any "implied warranties are limited, to the extent allowed by law, to the time periods covered by the express written warranties contained in this booklet." *Id.* at 4 ("Your Legal Rights"). The "Basic Limited Warranty" language explains:

> The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation.

*Id.* at 5. Coverage under the "Basic Limited Warranty" extends to the following: "You are covered by the Basic Limited Warranty if you are a purchaser for use of the vehicle." *Ibid.* The term of the "Basic Limited Warranty" begins on either (1) "the date you take delivery of the vehicle"; or (2) "the date when the vehicle was first put into service—for example, as a dealer 'demo' or as a Chrysler company vehicle." *Id.* at 6. Similarly, the "Powertrain Limited Warranty" states the scope of coverage as follows:

> The Powertrain Limited Warranty covers the cost of all parts and labor needed to repair a powertrain component listed in section 2.4.E below that is defective in workmanship and materials.

*Id.* at 9. The coverage for "transmission" parts includes any "transmission range switch" or "transmission control module." The "Powertrain Limited Warranty" similarly states that its coverage extends to any "purchaser for use" of the vehicle, and its term begins to run on the same date as

the "Basic Limited Warranty." *Ibid.* All versions of the warranty disclaim any coverage for "the costs of repairing damage or conditions caused by [among other things] abuse or negligence [and] misuse— for example, driving over curbs or overloading." *Id.* at 16.

### C. Procedural History

The transfer order from the JPML initiating this litigation was issued on October 5, 2016. That order transferred and consolidated five cases filed in this and other districts. Subsequent conditional transfer orders issued by the JPML added 18 more actions. Five more cases were originally filed in this district and reassigned to this Court as companion matters. The Court subsequently entered orders of dismissal disposing of five personal injury cases involving eight individual plaintiffs.

On March 15, 2017, the plaintiffs filed a consolidated master class action complaint comprising the claims of all plaintiffs pursuing claims for economic losses only. On March 21, 2017, the Court granted the defendant's motion to strike that first iteration of the consolidated economic loss complaint, which had added claims of 17 individuals who were not named as plaintiffs in any case transferred to this Court by the MDL panel. The plaintiffs filed their first amended consolidated economic loss complaint on March 24, 2017 and omitted those plaintiffs. However, the 17 individuals subsequently re-filed their claims in a new civil action in this district (*Berken v. FCA US, LLC,* No. 17–10983). Two of the plaintiffs in that case (Bruce Pollekoff and Brittani Sheppard) later voluntarily dismissed their claims.

On April 18, 2017, the Court issued an opinion denying the defendant's motion to dismiss for lack of subject matter jurisdiction. On April 19, 2017, the Court issued an opinion granting the defendant's motion to dismiss for lack of personal jurisdiction and dismissing the claims of 20 non-California plaintiffs who were named in a case transferred here from the Central District of California (the *Goldsmith* case, No. 16–13681 (E.D. Mich.) (a.k.a. *Goldsmith v. FCA US, LLC,* No. 16–01341 (C.D. Cal.); f/k/a *Andollo v. FCA US, LLC* ). Those 20 non-California plaintiffs have later re-filed their claims in a new case brought in this district (*Andollo v. FCA US, LLC,* No. 17–11376 (E.D. Mich. Apr. 28, 2017).

After the Court heard oral argument on the resent motion, New York plaintiff Michael Cruz voluntarily dismissed the claims he asserted in the FACMC on May 19, 2017.

### II.

The defendant argues that none of the counts in the FACMC states a viable cause of action under any of the theories of liability set forth. The claims are for false or deceptive advertising, fraudulent concealment, unjust enrichment, and breaches of express and implied warranties under the common law and consumer protection statutes of the various states, and for violating the federal Magnuson–Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* The defendant makes several arguments on each liability theory.

The defendant's motion is based on Federal Rule of Civil Procedure 12(b)(6). The standards are well known to the parties: the purpose of the motion is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the factual allegations in the complaint are taken as true. *Rippy ex rel. Rippy v. Hattaway,* 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir. 1993)). The complaint is viewed in the light most favorable to the plaintiff, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir. 2008).

To survive the motion, the plaintiffs "must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal*, [556 U.S. 662, 678], 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)." *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010).

■ At this stage of the case, the Court must accept as true the pleaded facts, but not factual conclusions unless they are plausibly supported by the pleaded facts. "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, can provide context to the factual allegations, but are insufficient to state a claim for relief and must be disregarded. *Iqbal*, 556 U.S. at 681, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). However, as long as a court can "'draw the reasonable inference that the defendant is liable for the misconduct alleged,' a plaintiff's claims must survive a motion to dismiss." *Fabian*, 628 F.3d at 281 (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

■ When deciding a motion under Rule 12(b)(6), the Court looks to the pleadings, *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008), the documents attached to them, *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)), documents referenced in the pleadings that are "integral to the claims," *id.* at 335–36, and documents that are not mentioned specifically but which govern the plaintiff's rights and are necessarily incorporated by reference, *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122

S.Ct. 992, 152 L.Ed.2d 1 (2002). However, beyond that, assessment of the facial sufficiency of the complaint ordinarily must be undertaken without resort to matters outside the pleadings. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).

## A. Fraud-based Claims

The defendant argues that all of the statutory and common law fraud and false advertising claims are insufficiently pleaded as a matter of law because the plaintiffs have not stated facts to establish many of the general elements of fraud. Those arguments are premised, in many respects, on the assertions that the plaintiffs have limited their claim of defect to the lack of an "auto-park" or "safety override" feature; the defendant's general representations the cars were "safe" and "reliable" are "mere puffery" and therefore cannot supply a basis for any actionable consumer fraud or false advertising claim; and the plaintiffs "effectively admit" that injury only could result from the plaintiffs' own "intervening acts" of leaving the engine running and getting out of the car without putting the car in "Park" before exiting. The defendant also contends that the allegations of fraud do not meet the specificity requirement of Federal Rule of Civil Procedure 9(b); some of the plaintiffs failed to satisfy the pre-suit notice requirements of some of the states' laws; the Pennsylvania plaintiffs' claims are barred by the economic loss doctrine; some of the plaintiffs bought their cars after the initial recall, and therefore cannot allege reliance on a false statement by the defendant; the Massachusetts plaintiff's fraudulent concealment claim is defective because the law of that state requires that the plaintiff plead that he is in privity with the defendant, which he is not; and the consumer fraud claims by the Nebraska and New York plaintiffs must be dismissed because the laws of those states require the plain-

tiff to plead that the public interest is affected by the alleged unlawful conduct, which they did not allege.

### 1. General Fraud Elements

### a. State Laws

Many of the states' common law fraud elements overlap. Some of the statutory causes of action incorporate fraud concepts along with additional elements.

- *California—Unfair Competition (Cal. Bus. & Prof. Code § 17200)* (Count VI)

■ California's Unfair Competition Law (UCL) "addresses 'unfair competition,' which 'mean[s] and include[s] any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law].'" *McGill v. Citibank, N.A.*, 2 Cal.5th 945, 216 Cal.Rptr.3d 627, 393 P.3d 85, 89 (2017) (quoting Cal. Bus. & Prof. Code § 17200). "The UCL and the [False Advertising Law (FAL)] prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public. Thus, to state a claim under either the UCL or the FAL, based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived." *Veera v. Banana Republic, LLC*, 6 Cal.App.5th 907, 914–15, 211 Cal.Rptr.3d 769 (2016).

- *California—Consumers Legal Remedies Act (Cal. Civ. Code § 1750)* (Count VII)

■ "The [California] Legislature enacted the [Consumers Legal Remedies Act (CLRA)] 'to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.'" *McGill*, 216 Cal.Rptr.3d 627, 393 P.3d at 89 (quoting (Cal. Civ. Code, § 1760)). "The CLRA sets forth 27 proscribed acts or practices." *Veera*, 6 Cal.App.5th 907, 915, 211 Cal.Rptr.3d 769. Among those are "[r]epresenting that goods or services have ... characteristics ... uses [or] benefits ... that they do not have," and "[r]epresenting that goods or services are of a particular standard, quality, or grade ... if they are of another." Cal. Civ. Code § 1770(a)(5), (7).

■ "[California Civil Code] Section 1782 imposes a condition on a consumer's ability to sue for damages under the CLRA." *Benson v. S. California Auto Sales, Inc.*, 239 Cal.App.4th 1198, 1206, 192 Cal.Rptr.3d 67 (2015). "The consumer must give notice in writing of the particular CLRA violations and demand a correction, repair, replacement, or other rectification." *Ibid.* "Under section 1782, subdivision (b), no action for damages may be maintained 'if an appropriate correction, repair, replacement, or other remedy is given, or agreed to be given within a reasonable time, to the consumer within 30 days after receipt of the notice.'" *Ibid.* "This section was added early in the legislative process to insure that the consumer must give the merchant an opportunity to correct his mistake." *Ibid.* "The notice requirement exists in order to allow a defendant to avoid liability for damages if the defendant corrects the alleged wrongs within 30 days after notice, or indicates within that 30-day period that it will correct those wrongs within a reasonable time." *Ibid.* "The clear intent of the act is to provide and facilitate pre-complaint settlements of consumer actions wherever possible and to establish a limited period during which such settlement may be accomplished." *Ibid.* California courts have "interpret[ed] section 1782 to create a requirement analogous to exhaustion of administrative remedies, or to a demand on the board of directors before filing a share-holder's derivative suit, or notification of a local public entity of a plaintiff's intent to sue for money or

damages." *Id.* at 1212, 192 Cal.Rptr.3d 67. "In all of these instances, a lawsuit cannot go forward until the potential plaintiff has received a response to a notice or the time for responding has expired," and if "the deficiency is caught early enough, it can result in a dismissal on demurrer." *Ibid.* (collecting cases). "If the plaintiff sues without fulfilling this requirement, the lawsuits are fatally defective from the beginning." *Ibid.*

● *California—False Advertising (Cal. Bus. & Prof. Code § 17500)* (Count VIII)

California's False Advertising Law "makes unlawful 'untrue or misleading' statements designed to 'induce the public to enter into any obligation' to purchase various goods and services." *McGill*, 216 Cal.Rptr.3d 627, 393 P.3d at 89 (quoting Cal. Bus. & Prof. Code § 17500). "Like the UCL, the false advertising law allows an action for relief to be brought by specified government officials and 'by any person who has suffered injury in fact and has lost money or property as a result of a violation.'" *Ibid.* (quoting Cal. Bus. & Prof. Code § 17535).

● *California—Fraudulent Concealment (Common Law)* (Count X)

■ Under California law, "[t]he elements of fraud are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Geraghty v. Shalizi*, 8 Cal.App.5th 593, 597, 215 Cal. Rptr.3d 61 (2017).

● *Massachusetts—Deceptive Acts or Practices (Mass. Gen. Laws Ch. 93A § 1)* (Count XXI)

■ Massachusetts "General Laws Chapter 93A § 2(a), states that '[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of

any trade or commerce are ... unlawful.'" *Silva v. Norfolk & Dedham Mutual Fire Insurance Company*, 91 Mass.App.Ct. 413, 75 N.E.3d 1132, 1135 (2017). "[A] plaintiff bringing an action for damages under [Chapter 93A], must allege and ultimately prove that she has, as a result, suffered a distinct injury or harm that arises from the claimed unfair or deceptive act itself." *Karaa v. Kuk Yim*, 86 Mass.App.Ct. 714, 20 N.E.3d 943, 953–54 (2014). And some "causal connection must exist between the unfair or deceptive conduct and the injury." *Bellermann v. Fitchburg Gas & Elec. Light Co.*, 470 Mass. 43, 18 N.E.3d 1050, 1060 (2014). "A written demand is required pursuant to [Massachusetts General Laws Chapter 93A, § 9(3) ], unless 'the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth.'" *Moronta v. Nationstar Mortg., LLC*, 88 Mass.App.Ct. 621, 41 N.E.3d 311, 315 n.11 (2015).

● *Massachusetts—Fraudulent Concealment (Common Law)* (Count XXII)

■ "Massachusetts does not recognize an independent claim for fraudulent concealment. Rather, [Massachusetts General Laws Chapter 260 § 12] tolls the statute of limitations for a cause of action if an alleged wrongdoer concealed its existence through some affirmative act done with the intent to deceive." *Niedner v. Ortho-McNeil Pharm., Inc.*, 90 Mass.App.Ct. 306, 58 N.E.3d 1080, 1087 n.7 (2016). However, Massachusetts courts recognize that "[o]rdinarily, a manufacturer of a product with known dangers has a duty to warn consumers who will foreseeably come in contact with, and be endangered by, the product of those dangers." *Id.* at 1084.

● *Missouri—Merchandising Practices Act (Mo. Rev. Stat. § 407.010)* (Count XXIX)

■ "The [Missouri Merchandising Practices Act (MMPA) ], as first adopted

by the legislature in 1967, protects consumers by expanding the common law definition of fraud to preserve fundamental honesty, fair play and right dealings in public transactions." *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 310–11 (Mo. App. 2016). "To prevail on a claim under the MMPA, a plaintiff. must plead and prove he, or she (1) purchased merchandise (which includes services) from defendants; (2) for personal, family: or household purposes; and (3) .suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful under the Merchandising Practices Act.". *Id.* at 311. The Act prohibits, among other things "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Stat. § 407.020(1). "It is the defendant's conduct, not his intent, which determines whether a violation has occurred," and "a consumer's reliance on an unlawful practice is not required under the MMPA." *Murphy*, 503 S.W.3d at 311.

● *Missouri—Fraudulent Concealment (Common Law)* (Count XXX)

 Under Missouri law, the "elements of fraudulent misrepresentation are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury." *Finest Place, Inc. v. Skidmore*, 477 S.W.3d 745, 748 (Mo. App. 2016). "Silence or non-disclosure is sufficient for the first element where the law imposes a duty to speak."

*Ibid.* "This analysis hinges on whether the seller had knowledge of undisclosed material information that the buyer would not have discovered through ordinary diligence." *Ibid.*

● *New York—Deceptive Practices & False Advertising (N.Y. Gen. Bus. Law § 349, 350)* (Counts XLIX, L)

 "Pursuant to [New York] General Business Law § 349, '[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state' are unlawful, and the statute provides an injured party with a private right of action to enjoin such unlawful acts or practices and to recover for violations of the statute." *JD & K Assocs., LLC v. Selective Ins. Grp., Inc.*, 143 A.D.3d 1232, 38 N.Y.S.3d 658 (N.Y. App. Div. 2016) (quoting N.Y. Gen. Bus. Law § 349(h)). "A plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Ibid.* New York General Business Laws section 350 "is a companion to [New York Gen. Bus. Law § 349]," which "provides that false advertising, 'in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.'" *People ex rel. Schneiderman v. Orbital Pub. Grp., Inc.*, 50 Misc.3d 811, 21 N.Y.S.3d 573, 585–86 (N.Y. Sup. Ct. 2015). For the purposes of sections 349 and 350 both, the New York "Court of Appeals has defined a deceptive act or practice as a representation or, omission likely to mislead a reasonable consumer acting reasonably under the circumstances." *Ibid.* "The threshold requirement of consumer-oriented conduct is met by a showing that the acts or practices have a broader impact on consumers at large in that they are direct-

ed to consumers or potentially affect similarly situated consumers." *Benetech, Inc. v. Omni Fin. Grp., Inc.*, 116 A.D.3d 1190, 984 N.Y.S.2d 186, 188 (N.Y. Ct. App. 2014).

● *New York—Fraudulent Concealment (Common Law)* (Count LII)

 Under New York Law, in order to plead a viable "cause of action to recover damages for fraud [the plaintiff] must allege: (1) a false representation of fact, (2) knowledge of the falsity, (3) intent to induce reliance, (4) justifiable reliance, and (5) damages." *Jgk Indus., LLC v. Hayes NY Bus., LLC*, 145 A.D.3d 979, 980, 45 N.Y.S.3d 479 (N.Y. App. Div. 2016). "To plead a cause of action alleging fraud in the inducement or fraudulent concealment, the plaintiff must allege facts to support the claim that it justifiably relied on the alleged misrepresentation." *Ibid.*

● *Pennsylvania—Unfair Trade Practices (73 Pa. Stat. § 201–1)* (Count LXVIII)

 The Unfair Trade Practices Consumer Protection Law (UTPCPL) "is Pennsylvania's consumer protection law. It seeks to prevent '[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce'" *Richards v. Ameriprise Fin., Inc.*, 152 A.3d 1027, 1034 (Pa. Super. 2016) (quoting 73 Pa. Stat. § 201–3). "The UTPCPL provides a private right of action for anyone who 'suffers any ascertainable loss of money or property' because of an unlawful method, act or practice." *Id.* at 1035 (quoting 73 Pa. Stat. § 201–9.2(a)). "Section 201–2(4) lists twenty enumerated practices which constitute actionable 'unfair methods of competition' or 'unfair or deceptive acts or practices.'" *Ibid.* (quoting 73 Pa. Stat. § 201–2(4)(i)-(xx)). Prohibited acts include " 'Representing that goods or services have ... characteristics, ingredients, uses [or] benefits ... that they do not have' "; " 'Advertising goods

or services with intent not to sell them as advertised' "; and " 'Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.' " *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 158 A.3d 203, 214 (Pa. Commw. Ct. 2017) (quoting 73 Pa. Stat. § 201–2(4)(v), (x), (xxi)). Pennsylvania courts have held that the "economic loss doctrine does not apply to UTPCPL claims," because "applying the economic loss doctrine to UTPCPL claims would render the catchall provision [subsection xxi] virtually meaningless." *Dixon v. Nw. Mut.*, 146 A.3d 780, 790 (Pa. Super. 2016).

● *Pennsylvania—Fraudulent Concealment (Common Law)* (Count LXIX)

 "The essential elements of a cause of action for fraud or deceit are misrepresentation, a fraudulent utterance thereof, an intention to induce action thereby, justifiable reliance thereon and damage as a proximate result." *V–Tech Servs., Inc. v. St.*, 72 A.3d 270, 275 (Pa. Super. 2013). "To be actionable, a misrepresentation need not be in the form of a positive assertion but is any artifice by which a person is deceived to his disadvantage and may be by false or misleading allegations or by concealment of that which should have been disclosed, which deceives or is intended to deceive another to act upon it to his detriment. Concealment can be a sufficient basis for finding that a party engaged in fraudulent conduct, provided that the other requisite elements of fraud are established." 72 A.3d at 275–76. "While concealment may constitute fraud, however, mere silence is not sufficient in the absence of a duty to speak." *Id.* at 276.

 The limitations period in Pennsylvania is two years for any "action or proceeding to recover damages for injury to

person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding ... including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter." 42 Pa. Stat. § 5524(7). However, it is well established under Pennsylvania law that if "through fraud or concealment the defendant causes the plaintiff to relax his or her vigilance or deviate from his or her right of inquiry, the defendant is estopped from invoking the bar of the statute of limitations." *Deek Inv., L.P. v. Murray*, 157 A.3d 491, 497 (Pa. Super. 2017).

● *Wisconsin—Deceptive Trade Practices Act (Wis. Stat. § 110.18)* (Count LXXXIII)

"Wisconsin's Deceptive Trade Practices Act, Wis. Stat. § 100.18(1), [ ] generally prohibits false, deceptive, or misleading representations or statements of fact in public advertisements or sales announcements." *Mueller v. Harry Kaufmann Motorcars, Inc.*, 359 Wis.2d 597, 859 N.W.2d 451, 457 (Wis. App. 2014). "There are three elements in a § 100.18 cause of action: (1) the defendant made a representation to the public with the intent to induce an obligation, (2) the representation was untrue, deceptive or misleading, and (3) the representation materially induced (caused) a pecuniary loss to the plaintiff." *MBS–Certified Pub. Accountants, LLC v. Wisconsin Bell Inc.*, 346 Wis.2d 173, 828 N.W.2d 575, 583 (Wis. App. 2013).

● *Wisconsin—Fraud by Concealment (Common Law)* (Count LXXXIV)

 Under Wisconsin law, a viable claim "for intentional misrepresentation requires proof that: (1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to [his or her] detriment." *John Doe 1 v. Archdiocese of Milwaukee*, 303 Wis.2d 34, 734 N.W.2d 827, 839 (Wis. Sup. Ct. 2007). "Either an affirmative representation or a failure to disclose, when there is a duty to disclose, can support a claim of intentional misrepresentation." 734 N.W.2d at 839.

b. Discussion

As an initial matter, there are several prominent and demonstrably false major premises that the defendant relies on for most of its challenges to the sufficiency of the pleaded claims for statutory and common law consumer fraud and breaches of warranties. Those must be dispelled. First among them is the assertion, which the defendant also relied upon throughout its briefing on the Rule 12(b)(1) motion, that the "only defect" alleged by the plaintiffs is "the absence of an auto park feature." The Court rejected that characterization in its previous opinion on that motion, but the defendant has stuck with those arguments anyway. They incorporate at least three false assertions about the allegations of the FACMC.

*First*, the defendant repeatedly asserts that nothing in the FACMC suggests that the shifter is "defective" in any way. It styles its argument this way:

Plaintiffs' express warranty claims are flawed at their core because there is no allegation in the FA[C]MC that any "item on [Plaintiffs'] vehicle" actually has a defect. Indeed, Plaintiffs' claims are based on the notion that the "defect" is the absence of an "item", i.e., an auto-park feature. Since the auto-park feature was not an "item on your vehicle when it left the manufacturing plant," the New Vehicle Limited Warranty simply does not apply.

Furthermore, the allegations of the FA[C]MC do not even suggest that the monostable shifter itself is defective. To the contrary, the allegations allow for only one conclusion: the monostable shifter operates exactly as it was designed to operate so that when placed in the park position, the vehicle is in that gear and remains there until a driver takes it out of that gear. Because the monostable shifter performs exactly as it was designed to perform, it cannot be deemed "defective" for purposes of an express warranty claim.

Def.'s Mot. to Dismiss at 37–38 (Pg ID 3266–67); *see also id.* at 1–2 ("Plaintiffs seek to impose massive liabilities on Defendant FCA US LLC based on the notion that monostable shifter vehicles are unsafe unless they are equipped with an 'automatic park' feature that engages whenever a driver exits the vehicle without first engaging the park gear.") (Pg ID 3230–31); *id.* at 5–6 ("Plaintiffs do not allege that the monostable shifter itself is defective. Rather, they aver that their vehicles as a whole are 'defective' because they are not equipped with a purported 'safety override' that Plaintiffs did not pay for and which FCA US did not promise.") (Pg ID 3234–35); *id.* at 8 ("[T]here is no allegation that Plaintiffs' vehicles have ever actually malfunctioned, or that any vehicle at issue in this lawsuit is prone to any actual malfunction.") (Pg ID 3237); *id.* at 15–16 ("Plaintiffs' statutory and common law fraud claims are all based on the notion that FCA US told Plaintiffs their vehicles were safe and it failed to tell them that the vehicles had no auto-park feature that would engage the park gear automatically whenever Plaintiffs exited a vehicle without taking the steps necessary to engage park.") (Pg ID 3243–44); *id.* at 20 ("[Plaintiffs] do not aver that they were led to believe that their vehicles had an auto-park feature, or that they could exit their vehicles without first engaging the park gear.") (Pg ID 3249).

Those assertions misrepresent the substance of the pleading. As is evident from the fact summary above, the plaintiffs allege in the FACMC that the gear shifter design is defective because (1) it gives insufficient indications to a driver about whether or not an intended gear selection has been completed, and about what gear actually is selected; and (2) even when an intended gear is selected, the mechanism may shift to another gear instead, allowing the car to move. They contend that the gear shifter design is defective because, due to "the lack of a physical gear level for PRND and the Defective Shifter's return to its predetermined location," and because "[g]ear-selection is conveyed to the driver by ... indicator lights, not gear-selector position ... drivers may draw erroneous conclusions about the status of their vehicles." FACMC ¶¶ 119–20. The plaintiffs also assert that "[t]he Defective Shifter's use of solely visual cues to alert drivers to the Class Vehicles' gear position is ineffective because drivers may not realize that they have not pushed the gear lever forward or backward enough to engage their desired gear," and that "[b]ecause there is no tactile feedback informing a driver whether the shifter lever has physically moved and is resting in P, R, N or D, drivers may think they have pushed the shifter lever forward enough to engage the Park gear and may exit the vehicle when it is not actually in Park." *Id.* ¶ 124. They contend that "[t]he Defective Shifter's sole reliance on visual feedback to convey gear selection has been dangerously ineffective," and that the defendant knew as much because "consumer complaints beginning at least as early as 2013 ... document Class Vehicle owners' and lessees' inability to determine whether their vehicle is in the desired gear resulting in hundreds of rollaways, accidents and injuries."

*Id.* ¶ 125; *see also* FACMC, Ex. A, NHTSA Report (Initial) ("NHTSA testing during PE15–030 indicates that operation of the Monostable shifter is not intuitive and provides poor tactile and visual feedback to the driver, increasing the potential for unintended gear selection.") (Pg ID 2953–54).

The plaintiffs also allege in the FACMC that "numerous complaints to NHTSA allege that once a driver puts a Class Vehicle into Park, the vehicle can move into another gear on its own," FACMC ¶ 125, and they describe in detail instances where the individual plaintiffs had similar experiences. *E.g.*, FACMC ¶¶ 55–59 (Plaintiff Brooks tried to put his car in "Park" at a gas station, but the "Park" setting did not engage, and the car rolled away across four lanes of traffic, eventually crashing into a fence.); FACMC ¶¶ 66–72 (Plaintiff Lynd had "multiple instances" where he tried to place his car in "Park" and realized as he was about to exit the vehicle that it actually was in "Drive" or "Reverse" instead, and even after he took his car to the dealer for a recall-related software fix to be applied, he has more than once tried to put the car in "Park" using the shifter, "only to watch the transmission shift instead to a different gear."); FACMC ¶ 75 (Plaintiff Mack put her car in "Park" and got out to unload it while it was in the driveway of her grandmother's home, but, as she was unloading items, the car rolled away and was damaged.); FACMC ¶ 87 (Plaintiff Weber had incidents where he tried to put his car in "Park" and thought that it was in "Park," only to discover when he tried to exit the car that it was in "Reverse" instead.). The complaint further enumerates 15 examples of reports to NHTSA by owners of class vehicles, logged between April 2013 and May 2016, of incidents where a driver shifted the car into "Park," and the car appeared to be in "Park," but after the driver exited the car it rolled away under

its own power. FACMC ¶ 146 (Pg ID 2671–84). In several of those incidents the drivers reported that the gear shift indicator clearly "showed the vehicle to be in Park," but the car nevertheless was in another gear, or shifted to another gear after the driver got out.

Chrysler's assertion that the FACMC's only allegation of defect is that the vehicles did not include an auto-park feature is a canard that undermines the arguments that flow from it.

*Second*, the defendant asserts that the plaintiffs "admit" that their cars are perfectly safe, and that there will be "no problem" when the vehicles are used as intended. Chrysler says it reads the FACMC to include an admission that if drivers "put the monostable shifter into the park position before exiting their vehicles, there will be absolutely no problem at all." Chrysler maintains that "most" of the plaintiffs fail to allege that "they have ever had, or that they even anticipate having, any problem with the monostable shifter." Def.'s Mot. at 41 (Pg ID 3270); *see also id.* at 15 ("Plaintiffs effectively admit that their own intervening acts—failing to engage the park gear—is the ultimate and necessary prerequisite to the threat of any injury."); *id.* at 32 ("It is inconceivable that an alleged defect that could not possibly manifest absent customer misuse, and which now cannot manifest even with misuse, could significantly impact the public interest.") (Pg ID 3261); *id.* at 42 ("Plaintiffs do not allege that their vehicles are unfit for driving. At best they allege that if they fail to move the monostable shifter to the park position, and if they exit their vehicles with the motor still running, an unsafe condition might result.") (Pg ID 3271).

Those assertions likewise misrepresent the contents of the pleading. The plaintiffs do not "admit" any such thing anywhere in

the FACMC, and the defendant conspicuously fails to cite any portion of the FACMC to substantiate such an "admission." Moreover, as discussed above, the plaintiffs describe in specific detail numerous instances in which serious and dangerous mishaps arose from operation of the class vehicles, despite the best efforts of drivers to operate them properly, safely, and in the usual and intended way.

*Third,* the defendant asserts that "[t]here are no averments that [Chrysler] knew, prior to the sale of each Plaintiff's vehicle, that the driver of a vehicle equipped with a monostable shifter would be any more likely to leave the vehicle without putting it in park than the driver of any other vehicle." Def.'s Mot. at 18 (Pg ID 3247); *see also id.* at 16 ("Failing to install a feature that a consumer was never promised and that a manufacturer was not duty-bound to provide is not an 'omission' encompassed by common-law or statutory fraud.") (Pg ID 3245); *id.* at 19 ("The failure to allege facts establishing pre-sale knowledge requires dismissal of the fraudulent concealment claims under all states' laws.") (Pg ID 3248); *id.* at 21 ("Plaintiffs also do not, and cannot plausibly, allege that they believed their vehicles would automatically engage park when they exited. Nor can they plausibly claim that the failure to tell them that their vehicles would not automatically engage park led them to exit their vehicles without engaging the park gear.") (Pg ID 3250).

But defense counsel must have missed the allegations in paragraph 140 and Exhibit B, where the plaintiffs assert that the defendant had specific knowledge of the shifter defect based on its own internal testing and design process, and based on customer complaints it received soon after the vehicles entered the market: "Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, early con-

sumer complaints made to Defendant's network of exclusive dealers and NHTSA, basic design guidelines, and testing performed in response to consumer complaints, inter alia, Defendant was aware (or should have been aware) of the defect in the Defective Shifter." FACMC ¶ 140. The plaintiffs also point to a design analysis by NHTSA, which concluded that the shifter design violates several basic design principles, and that FCA received reports about problems with the shifter soon after vehicles went on the market (as early as 2011):

> FCA received negative consumer feedback for the Monostable shifters shortly after the subject vehicles entered the market. Field data indicates that the design resulted in higher error rates during attempted shifts to Park and higher rates of powered rollaway incidents. The Monostable design appears to violate several basic design guidelines for vehicle controls such as: 1) be consistent; 2) controls and displays should function the way people expect them to function; 3) minimize what the user has to remember; and 4) operations that occur most often or have the greatest impact on driving safety should be the easiest to perform. FCA changed to Polystable electronic gearshift assemblies in MY 2015 Charger / 300 cars and MY 2016 Grand Cherokee vehicles. The Polystable gearshift assemblies stay in the position of the selected gear, similar to a standard mechanical shifter, providing drivers with the expected tactile and visual feedback (i.e., works as expected and does not require additional thought or attention).

FACMC, Ex. B, NHTSA Report (Final) (Pg ID 2956–57). In those sections of the FACMC, the plaintiffs positively allege that the defendant knew that the gear shift was dangerously unreliable based on its own internal design and testing analyses, and that the defect was confirmed by

external reports received from customers starting from soon after the vehicles entered the market. The plaintiffs also point to a combined total of 686 reports of rollaway incidents, 266 of which resulted in accidents, and 68 of which produced injuries, where the vast majority of those reports (526 reports, with 199 crashes and 43 injuries) were received by the defendant and disclosed by it to NHTSA in its 2016 defect report. *See id.* (Pg ID 2956).

In its reply brief the defendant purports to be startled and alarmed by these "new" assertions about the nature of the defect. It professes to be unable to locate any such allegations in the FACMC, and it declares that the plaintiffs are "try[ing] to save their claims by changing what this case is about." The defendant contends that "[i]f, as it now appears, Plaintiffs want this case to be about a 'defect' where a shifter fails 'to engage' or 'stay' in Park, then the FA[C]MC should be dismissed forthwith," because "[a] complaint cannot be amended by making new allegations in a response brief." Def.'s Reply at 1 (Pg ID 4380).

That position simply ignores the plain text of the FACMC, as discussed above. And the defendant does not explain when, or how, the case was "about" something other than what is alleged in the FACMC. It does not cite any authority for the unusual proposition that an amended pleading must be dismissed because it clarifies or expands allegations or the factual basis for them, or because, as seems to be the case here, it makes allegations that the defendant simply does not want to confront. Moreover, this stage of the case, as was made clear by the Court's earlier orders directing the parties to file consolidated pleadings and motions challenging them, is precisely the time for establishing and clarifying "what the case is about." And true to the Court's direction, the FACMC sets forth "what the case is about" according to the plaintiffs. The

pending motions are (or were intended to be), the defendant's chance to challenge the legal sufficiency of those allegations, and, where appropriate, to narrow the issues "that the case is about." Instead, it appears that the defendant has expended the bulk of its effort recharacterizing the FACMC in a way that deviates from its actual allegations, and complicates the task of taking seriously its attacks on the claims pleaded.

Turning to the specific challenges, Chrysler says that the plaintiffs have not alleged adequately the elements of common law and statutory consumer fraud, including the elements of "reliance," "causation," and "loss," where those elements are required by the law of the various states. The Court disagrees.

 The consumer fraud statutes of all the states in question prohibit by various terms "deceptive," "misleading," or "unfair," conduct, and here the plaintiffs adequately allege as much where they assert that the defendant advertised its cars as "safe" and "reliable," while failing to disclose to them any hint of the risks posed by the gear shifter design, which they say is dangerously unreliable. On similar allegations, the district court in *In re Toyota Motor Corp.*, 790 F.Supp.2d 1152 (C.D. Cal. 2011) (applying California law), concluded that the elements of consumer fraud claims adequately were made out:

> Here, all Plaintiffs allege that they relied on Toyota's representations about safety and reliability when purchasing their Toyota vehicles. All allege that they would have made a different purchasing decision had it been disclosed that Toyota vehicles could accelerate suddenly and dangerously out of the driver's control and lacked a fail-safe mechanism to overcome this. Because Plaintiffs allege that they would have made a different purchasing decision but

for Toyota's misrepresentations, Plaintiffs have lost "money or property" within the meaning of the UCL and FAL.

. . .

[Likewise,] [b]ecause Plaintiffs allege that they would have made a different purchasing decision but for Toyota's misrepresentations, Plaintiffs satisfy the actual reliance requirement under the UCL and FAL.

Furthermore, actual reliance may be presumed because the alleged SUA defect is material. As discussed more fully in the Court's November 30, 2010 Order, the propensity of a vehicle to accelerate suddenly and dangerously out of control is material to a reasonable person, which satisfies the causation requirement under the UCL and FAL.

[The] [p]laintiffs also sufficiently allege a material misrepresentation [for purposes of their claim under the CLRA]: the propensity of a vehicle to accelerate suddenly and dangerously out of control is material to a reasonable person. This satisfies the actual causation and reliance requirements for purposes of the CLRA.

*In re Toyota Motor Corp.*, 790 F.Supp.2d at 1168–70.

The defendant argues that all of the statutory and common law fraud and false advertising claims are insufficiently pleaded as a matter of law because the plaintiffs do not allege (1) that the cars lack a specific safety feature that was advertised or that they desired, and instead they assert only that the cars lack a feature ("auto-park" or "safety override") that none of the plaintiffs allege that they expected or bargained for; or (2) that the defendant ever made any affirmative representation that the cars had an "auto park" feature or that they relied on the presence of that feature in deciding to buy or lease their cars. Those arguments, as discussed above, are fallacious and imma-

terial. The plaintiffs allege that the gear shift design is dangerously defective, with or without an "auto park" feature. They assert that the danger is exaggerated by the lack of such a feature, but they do not allege that the lack of that feature is the *only* defect. Whether the defendant ever represented that the cars had an "auto park" feature is irrelevant to the basis of the defect and concealment claims that actually were pleaded.

Moreover, while persistently fixating on the "auto park" feature, the defendant overlooks the fact that the retrofitted feature only would work if *one of the car's doors is opened.* If, as the plaintiffs allege, the gear shifter does not reliably inform drivers about what gear the car is in, or indicates one gear when another is selected, or allows the car randomly to shift from the "Park" setting to a travel gear, then the design poses a serious risk of unintended vehicle movement *any time a driver attempts to select a gear*, not only when a driver opens the door and exits the vehicle. This risk is borne out by reports enumerated in the FACMC, which were received by NHTSA *after* the recall remedy was issued and installed, showing that it does not eliminate the dangers posed by the unreliable shifter. *See* FACMC ¶ 185 at 98–99 (Pg ID 2706–07). The defendant's contention that the defect fully was cured by installation of the "auto park" remedy does not square with the facts plainly described in the FACMC.

The defendant argues that the representations cited in the FACMC that the cars were "safe" and "reliable" are "mere puffery" and therefore cannot supply a basis for any actionable consumer fraud or false advertising claim. Whether or not that is true, the FACMC states cognizable claims for fraud by omission. It alleges that the defendant knew about the dangerously unreliable design of the shifter through de-

sign and testing performed before the cars were sold, and confirmed by customer reports after they entered the market, but it never disclosed to any buyers the risks of that design before or when they bought their cars, until it finally issued a recall notice in April 2016, more than five years after cars with the defective shifter went on the market.

Similarly, the defendant argues that the plaintiffs have not alleged any facts to establish that the defendant had "superior" or "exclusive" knowledge that the cars lacked an "auto park" feature and that any duty was imposed on it to disclose the absence of that feature. Once again, the FACMC plainly alleges that Chrysler knew the gear shifter was defective, principally because it designed it, and it therefore knew that, by design, the shifter was dangerously unreliable. The complaint plausibly alleges that the dangers of the design were, or should have been, obvious from the fact that the shifter violates several basic design principles, and from analysis and testing that the defendant conducts on its cars. FACMC ¶ 140; see also FACMC ¶ 133 ("every mechanical and electronic component, body part and trim element is rigorously tested"; "designers work with a team of researchers during the testing phase to ensure vehicles meet the highest standards in terms of safety, ecological profile, driving performance and quality."). The FACMC's allegations plausibly establish that the shifter does not perform as intended, because it certainly cannot have been the intent of any reasonable car designer to create a shifter that only shifts into the intended gear some of the time, or that randomly shifts to gears other than the one selected. And the defendant has not pointed to any information that it gave to buyers about any aspect of the shifter design that would inform prospective buyers that the gear shifter was unreliable in those ways.

The defendant further argues that (1) the plaintiffs cannot plausibly allege that they did not know their cars lacked an "auto park" feature, because all of them alleged that they shifted (or tried to shift) their cars into "Park" before exiting the vehicles, and none alleged that they regularly exited their cars without first putting them in "Park"; (2) failing to install a particular safety feature in a product that was not advertised by the maker or sought by the purchaser, and that the maker had no duty to provide, is not an "omission" cognizable as statutory or common law fraud; and (3) scattered references to anonymous "consumer complaints" from the Internet and elsewhere are not sufficient to show plausibly that the defendant knew that the vehicles were defective without an "auto park" feature before any of the plaintiffs bought or leased their cars. Again, all of those arguments either lack a factual basis or are immaterial to the substance of the actual allegations in the FACMC, where the plaintiffs allege that the gear shifter is dangerously unreliable with or without an "auto park" feature. The plaintiffs plainly do not allege that the absence of that feature is the sole or principal safety hazard of the design, and they do allege that the defendant was well aware of the actual dangers of the design as a result of its own analysis and testing, its awareness of elementary design principles, and numerous reports of rollaway incidents received from customers, starting from soon after the vehicles entered the market.

Finally, the defendant contends that no misrepresentation about any feature of the cars could have produced any injuries to which the plaintiffs allude, because the plaintiffs "effectively admit" that injury only could result from the plaintiffs' own "intervening acts" of leaving the engine running and getting out of the car without putting the car in "Park" before exiting.

The plaintiffs admit no such thing, and the premise of that argument is a fallacy.

## 2. Specificity (Rule 9(b))

The defendant argues that the common law and statutory fraud claims do not meet the requirements of Rule 9(b) because none of the plaintiffs have alleged what specific information was presented to them, and when, that comprised a false representation about the cars, and, similarly, as to the claims of omission or concealment, the plaintiffs have failed to allege what specific information was concealed from them, or when it should have been revealed.

■ "To file a fraud claim, a plaintiff must state with 'particularity the circumstances constituting fraud.'" *Wall v. Michigan Rental*, 852 F.3d 492, 496 (6th Cir. 2017) (quoting Fed. R. Civ. P. 9(b)). "To meet this requirement, the plaintiff must allege (1) 'the time, place, and content of the alleged misrepresentation,' (2) 'the fraudulent scheme,' (3) the defendant's fraudulent intent, and (4) the resulting injury." *Ibid.* (quoting *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493, 504 (6th Cir. 2007)).

■ The plaintiffs here allege that the defendant failed to disclose to them anything about the risks posed by the dangerous and unreliable shifter design; that it knew about the problems with that design as a result of its own testing and design analysis, and customer complaints received from early in the market life of the product; that it should have disclosed the defect at or before the respective dates on which they bought their cars; and that, instead, the defendant concealed its knowledge of the defect until it finally declared a recall of the vehicles on April 22, 2016 and sent a letter to affected owners and lessees in June 2016. The plaintiffs assert that the defendant concealed its knowledge of the defect to induce them to pay more than they otherwise would for the cars, if they knew about the risks of the shifter design. As a result, they paid more for the cars than they actually were worth, suffered increased depreciation as a result of negative market perceptions about the cars, and also had to absorb the expense and inconvenience of accommodating the defendant's failed repair attempts, which they contend have not so far fixed the problems with the shifter design. Those allegations are sufficiently specific to state viable claims for fraudulent concealment and congruent statutory violations. *Falk v. Gen. Motors Corp.*, 496 F.Supp.2d 1088, 1099 (N.D. Cal. 2007) ("Plaintiffs adequately state a claim of fraud by omission. They allege that GM was bound by a duty to disclose material facts about its speedometers from 2003 to 2007. GM failed to disclose this information, and plaintiffs reasonably claim that they suffered damages after justifiably relying on GM's failure to disclose any defects with the speedometers. GM's motion to dismiss the fraud by omission claim under Rules 12(b)(6) and 9(b) is therefore Denied.").

## 3. Pre–Suit Notice

The defendant argues that the statutory consumer fraud claims by California plaintiffs Goldsmith, Nathan, and Pietri (Counts VI–VIII) and Massachusetts plaintiff Hartt (Count XXI) must be dismissed because the applicable statutes mandate that, before filing suit, a plaintiff in a consumer fraud case must send a "demand letter" to the defendant identifying the specific deceptive practice and the injury suffered as a result.

■ The FACMC adequately alleges facts to show that the California plaintiffs gave timely notice of their CLRA claims at least 30 days before asserting any claim for money damages under the Act, which first was raised in the consolidated pleading filed in this Court in December 2016.

Under the circumstances, and at this stage of the case, nothing more is required for their claims to proceed. The FACMC alleges that the California plaintiffs "provided FCA with notice of its violations of the CLRA pursuant to CAL. CIV. CODE § 1782(a)," and that "[t]he notice was transmitted to FCA on July 8, 2016." FACMC ¶ 315. The Court is required to accept that allegation as true at this stage of the case, but the docket indicates that the original complaint in the California matter was filed on June 23, 2016, before the plaintiffs assert that they sent their demand letter. In California it is well accepted that failure to comply with the pre-suit notice provision bars an action for money damages under the CLRA. "[California Civil Code] Section 1782 imposes a condition on a consumer's ability to sue for damages under the CLRA." *Benson v. S. California Auto Sales, Inc.*, 239 Cal. App.4th 1198, 1206, 192 Cal.Rptr.3d 67 (2015). However, in their original complaint in the California district court, the plaintiffs did not assert any claim under the CLRA. And in their first amended complaint, they raised a claim under the CLRA, but prayed for injunctive relief only. In that pleading, the plaintiffs stated:

> In accordance with Civil Code § 1780(a), Plaintiffs and the other Class members seek injunctive and equitable relief for FCA's violations of the CLRA, including an injunction to enjoin FCA from continuing its deceptive advertising and sales practices. In addition, after mailing appropriate notice and demand in accordance with Civil Code § 1782(a) & (d), Plaintiffs and the other Class members will amend this Class Action Complaint to include a request for damages.

First Am. Compl. [dkt. # 2] ¶ 118, *Goldsmith v. FCA US, LLC*, No. 16–13681 (E.D. Mich.) (filed on July 7, 2016 in *Goldsmith v. FCA US, LLC*, No. 16–01341 (C.D. Cal.)). California law approves of that procedure where a plaintiff raises only a demand for injunctive relief under the CLRA in an initial pleading, and then later sends a demand letter before filing an amended complaint adding a claim for money damages. *Morgan v. AT & T Wireless Servs., Inc.*, 177 Cal.App.4th 1235, 1260, 99 Cal.Rptr.3d 768 (2009) (stating that "the statute expressly allows such an amendment, as long as it is done 30 days or more after filing of the original complaint and compliance with the notice requirement") (citing Cal. Civ.Code, § 1782(d)).

The demand for money damages first was asserted in the original version of the FACMC [dkt. # 31], which was filed in this litigation on December 23, 2016, well beyond the statutory 30–day notice window. The defendant contends that the demand letter which was sent was inadequate because it did not describe the claims in sufficient detail. But the Court is obligated at this stage of the pleadings to accept the summary allegation that notice sufficient to satisfy the statute was sent. *See* Fed R. Civ. P. 9(c) ("In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed."). Moreover, the defendant has not cited any authority holding that the pre-suit notice required by section 1782 (which is a specific provision of the CLRA) is mandated before filing suit under the UCL or FAL. Those claims, therefore, do not implicate any pre-suit notice requirement.

■ Massachusetts plaintiff Hartt was not required to send a demand letter under the circumstances, so far as they may be extracted from the allegations of the FACMC. The Massachusetts Supreme Court has held that a consumer is excused from the pre-suit notice requirement under Massachusetts General Laws Chapter 93A § 9 where the defendant does not maintain a place of business within the state, or

where it holds no assets there. The defendant has not pointed to any facts to suggest that it maintains a place of business in Massachusetts and that it holds assets in the state (both are required to trigger the entitlement to a pre-suit notice), and there certainly are none within the four corners of the FACMC to suggest as much. *Moronta v. Nationstar Mortg., LLC*, 476 Mass. 1013, 64 N.E.3d 1287, 1290 (2016) ("[Chapter 93A 9(3)] clearly excuses the plaintiff from serving a demand letter if the prospective respondent either lacks a place of business in Massachusetts or does not keep assets in Massachusetts."). Moreover, the Massachusetts courts construe the demand letter requirement as an affirmative defense, not a pleading requirement, or an absolute bar to suit. *See Silva v. Norfolk & Dedham Mutual Fire Insurance Co.*, 91 Mass.App.Ct. 413, 75 N.E.3d 1132, 1139 n.5 (2017) ("[The defendant argues] that the [Chapter] 93A claim was barred because Silva failed to make a specific demand for postjudgment interest in his demand letter. While Norfolk & Dedham asserted § 9(3) as an affirmative defense in its answer, it did not raise this issue in its opposition to Silva's motion for summary judgment or otherwise flag it prior to (or even after) trial.").

### 4. Economic Loss Doctrine

■ The defendant argues that the common law and statutory consumer fraud claims by Pennsylvania plaintiffs Weber and Vosburgh (Counts LXVIII and LXIX) must be dismissed because under the law of that state the "economic loss doctrine" bars recovery on any such claims where the only damages alleged are loss of value or benefit of the bargain, and the plaintiffs do not allege any injury apart from diminished value of the allegedly defective product. However, the plaintiffs correctly point out that subsequent controlling decisions of the Pennsylvania courts have held that the "economic loss doctrine does not apply

to UTPCPL claims," because "applying the economic loss doctrine to UTPCPL claims would render the catchall provision [subsection xxi] virtually meaningless." *Dixon v. Nw. Mut.*, 146 A.3d 780, 790 (Penn. Super. 2016); *see also Kantor v. Hiko Energy, LLC*, 100 F.Supp.3d 421, 429 (E.D. Pa. 2015) ("We cannot ignore what the Pennsylvania courts have decided and how the law in Pennsylvania has evolved since [*Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3d Cir. 2002)] was decided. Therefore, in light of the [holding in *Knight v. Springfield Hyundai*, 2013 Pa.Super. 309, 81 A.3d 940 (Penn. Super 2013)] that the economic loss doctrine does not apply to UTPCPL claims, and the Pennsylvania Supreme Court's recognition that the economic loss doctrine is limited to negligence actions and does not bar a negligent misrepresentation claim, we conclude that the doctrine does not bar [the plaintiff's] statutory-based cause of action for fraud and misrepresentation under the UTPCPL.").

Similarly, the controlling Pennsylvania decisions on point have not expanded the application of the economic loss doctrine to common-law tort claims beyond limiting the damages available in actions for negligence, and lower Pennsylvania courts have resisted the invitation to do so. *Excavation Techs., Inc. v. Columbia Gas Co. of Pennsylvania*, 604 Pa. 50, 985 A.2d 840, 841 (2009) ("[T]he economic loss doctrine generally precludes recovery in negligence actions for injuries which are solely economic."); *see also Price v. Freeze & Frizz Inc.*, 11 Pa. D. & C. 5th 486, 502 (Pa. Com. Pl. Nov. 19, 2009) ("[W]hile the economic loss doctrine applies to claims based on a defendant's negligence, the courts of this Commonwealth have declined to broaden the doctrine's scope to include tortious claims other than negligence.... Because the economic loss doctrine is inapplicable

to fraud claims, defendant's argument in this respect lacks merit.").

### 5. Post–Recall Purchases

■ The defendant argues that the fraud claims by California plaintiff Pietri (Counts VI–VIII, X), and Missouri plaintiff Brooks (Counts XXIX and XXX) must be dismissed because under the laws of those states a plaintiff alleging consumer fraud must plead that some fact was misrepresented or concealed before or in connection with a purchase, and those plaintiffs specifically allege that they bought their cars after the April 22, 2016 recall was issued. According to the FACMC, Pietri bought his car on May 1, 2016, and Brooks bought his on May 28, 2016. Both plaintiffs contend that they still have viable claims because the defendant did not specifically inform them, as prospective purchasers, about the recall defect before they bought their cars. Plaintiff Brooks also asserts that he was falsely informed by the dealer that sold him the car that his car already had received the recall fix when it had not. FACMC ¶ 56–57 ("After Plaintiff Brooks independently learned of the recall, he called his dealership to inquire into the safety of his defective vehicle. The dealership informed Plaintiff Brooks that the recall on his specific vehicle had been fixed . . . . . [However, a]fter [he experienced a rollaway] incident [on July 11, 2016], Plaintiff Brooks double-checked his vehicle's VIN number and learned that his vehicle had not, in fact, been fixed; rather, the recall was simply 'educational.' ").

Brooks does not allege that the defendant made any representation to him about the recall defect or any fix for it, before or after he bought his car. And neither of those plaintiffs has cited any authority for the proposition that a consumer can maintain a viable claim for statutory or common law consumer fraud concerning an allegedly concealed defect after the date when the defendant had filed a recall notice of the defect with NHTSA. Although both plaintiffs contend that the defendant and their car dealers did not inform them personally about the recall before they bought their cars, there does not appear to be any set of facts on which they plausibly can allege, under the circumstances, that the defendant intended to, or actually did, conceal from them as consumers information about a defect that was the subject of the April 22, 2016 recall notice.

The Court, therefore, will dismiss the statutory and common law fraud claims by California plaintiff Pietri under Counts VI–VIII, X, and those by Missouri plaintiff Brooks (Counts XXIX and XXX). Since Brooks is the only surviving plaintiff at this stage of the case with live claims under Counts XXIX and XXX, those counts will be dismissed in their entirety.

### 6. Privity

The defendant contends that Massachusetts plaintiff Hartt's fraudulent concealment claim (Count XXII) is defective because the law of that state requires a plaintiff to plead that he is in privity with the defendant, but Hartt admits that he bought his car from a third party, not the defendant. However, this count is subject to dismissal for a different reason: "Massachusetts does not recognize an independent claim for fraudulent concealment. Rather, [Massachusetts General Laws Chapter 260 § 12] tolls the statute of limitations for a cause of action if an alleged wrongdoer concealed its existence through some affirmative act done with the intent to deceive." *Niedner v. Ortho–McNeil Pharm., Inc.*, 90 Mass.App.Ct. 306, 58 N.E.3d 1080, 1087 n.7 (2016). Because there is no cause of action for "fraudulent concealment," under Massachusetts law, the Court will dismiss plaintiff Hartt's claims in Count XXII.

### 7. Public Interest

■ Chrysler contends that the plaintiffs have not set out facts to show that their claims implicate the public interest. It bases that argument on the assertion that it "is undisputed that the vehicles at issue stay in park if placed in park, and that a safety risk arises only if a driver exits the vehicle while it is running and simultaneously fails to shift to park." The defendant also argues that the "public interest" cannot be impacted where the alleged safety defect—lack of an "auto park" feature—has been remedied by the defendant's provision of that very feature for free via the recall. Those arguments, of course, are based on the same false premises discussed at length above, and they are groundless for the same reasons.

The plaintiffs have stated sufficient facts to establish that the alleged defect meets the public interest requirement under the New York consumer protection statute. They allege in the FACMC that (1) the defective gear shifter design was installed in more than 800,000 vehicles sold by the defendant; (2) the defect has not effectively been remedied in at least 13,000 of those vehicles; and (3) the defect has produced at least 686 reports of rollaway incidents, resulting in 286 crashes, and 68 of those incidents produced injuries. Those allegations certainly are sufficient to meet New York's "threshold requirement of consumer-oriented conduct ... by a showing that the acts or practices have a broader impact on consumers at large in that they are directed to consumers or potentially affect similarly situated consumers." *Benetech, Inc. v. Omni Fin. Grp., Inc.*, 116 A.D.3d 1190, 1190, 984 N.Y.S.2d 186 (N.Y. App. Ct. 2014).

### B. Unjust Enrichment

Chrysler argues that all of the unjust enrichment claims must be dismissed because (1) the plaintiffs cannot plausibly allege that any benefit was conferred on the defendant by their purchases of the vehicles where all of those purchases were from third-party dealers and not the defendant; (2) the assertion that some benefit was conferred on the defendant when the plaintiffs visited dealers to receive a free post-recall software fix for their cars that installed an "auto park" feature "defies logic"; and (3) the plaintiffs cannot proceed on an unjust enrichment theory where the separately-pleaded consumer fraud and breach of warranty claims offer them an adequate remedy at law for any losses caused by the alleged defect.

The defendant also contends that the claims by Massachusetts plaintiff Hartt (Count XXIII), New York plaintiffs Lynd, and Mack (Count LIII), Pennsylvania plaintiffs Weber and Vosburgh (Count LXXII), and Wisconsin plaintiff Marc Hughes (Count LXXXVI) all are barred as a matter of law because the plaintiffs affirmatively allege that they were indirect purchasers and bought their cars from third-party dealers, not directly from the defendant.

As with the fraud claims, the various states' common law defining the elements of unjust enrichment overlap. The plaintiffs argue that the law of the forum—Michigan—should govern. But those fine distinctions are not necessary to address the present motion. "[T]he typical elements of a cause of action for unjust enrichment are: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant accepted and retained the benefit; and (3) it would be unjust for the defendant not to pay the plaintiff the value of the benefit." *In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d 618, 671 (E.D. Mich. 2000) (applying the common law of California, New York, and Wisconsin, among other states). Other states' articulation of the elements follow form.

- *Massachusetts (Count XXIII)*

█ Under Massachusetts law, recovery is allowed on an unjust enrichment theory where the defendant has received and retained some benefit where equity requires the restoration of the same to the plaintiff. "What is required, generally, is that a party hold property under such circumstances that in equity and good conscience he ought not retain it." *Stevens v. Nagel*, 64 Mass.App.Ct. 136, 831 N.E.2d 935, 939 (2005).

- *Missouri (Count XXXIII)*

█ Under Missouri law, the "essential elements of unjust enrichment are: (1) the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; and (3) that it would be unjust to allow the defendant to retain the benefit." *Central Parking System of Missouri, LLC v. Tucker Parking Holdings, LLC*, 519 S.W.3d 485, 498 (Mo. App. 2017).

- *New York (Count LIII)*

█ Under New York law, the "elements of a cause of action to recover for unjust enrichment are (1) the defendant was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Travelsavers Enters., Inc. v. Analog Analytics, Inc.*, 149 A.D.3d 1003, 1006, 53 N.Y.S.3d 99 (N.Y. App. Div. 2017). "The theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties." *Id.* at 1006–07, 53 N.Y.S.3d 99 "Although privity is not required for an unjust enrichment claim, a claim will not be supported if the connection between the parties is too attenuated." *Id.* at 1007, 53 N.Y.S.3d 99.

- *Pennsylvania (Count LXXII)*

█ Pennsylvania law recognizes "unjust enrichment [as] an equitable doctrine." *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 158 A.3d 203, 231 (Pa. Commw. Ct. 2017). "It is the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, for which the beneficiary must make restitution. An action based on unjust enrichment is an action which sounds in quasi-contract or contract implied in law." *Ibid.*

- *Wisconsin (Count LXXXVI)*

█ Under Wisconsin law, the "elements of unjust enrichment are: (1) a benefit conferred upon the defendant by the plaintiff; (2) knowledge or appreciation of the benefit by the defendant; and (3) acceptance or retention by the defendant of such benefit under such circumstances that it would be inequitable for him or her to retain it without paying the value thereof." *Admiral Ins. Co. v. Paper Converting Mach. Co.*, 339 Wis.2d 291, 811 N.W.2d 351, 360 n.16 (2012).

█ The plaintiffs adequately have pleaded that the defendant received a benefit (the inflated prices paid by them for their cars), that it knew it received it, and that it would be unfair for the defendant to retain it (because of its wrongful concealment of the defective gear shift design, which all of the plaintiffs alleged would have led them to reconsider the purchase of their car, or to have paid less for it).

█ The defendant argues that all of the unjust enrichment claims must be dismissed because the plaintiffs cannot plausibly allege that any benefit was conferred on the defendant by their purchases of the vehicles where all of those purchases were from third-party dealers and not the de-

fendant. But "the courts dismiss such claims only where the plaintiffs fail to allege facts showing that they have bestowed some sort of benefit upon the defendant that the defendant ought not keep in equity and good conscience." *In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d at 671. The defendant also argues that the plaintiffs cannot proceed on an unjust enrichment theory where their consumer fraud and breach of warranty claims offer them an adequate remedy at law for any losses produced by the alleged defect. However, unjust enrichment claims routinely are allowed to proceed when pleaded in the alternative to other viable claims for relief. *In re K–Dur Antitrust Litig.*, 338 F.Supp.2d 517, 544 (D.N.J. 2004) ("Defendants contend that equitable remedies such as unjust enrichment will not be granted where an adequate remedy at law exists," but the plaintiffs "are clearly permitted to plead alternative theories of recovery," and "[c]onsequently, it would be premature at this stage of the proceedings to dismiss the ... unjust enrichment claims on this basis.") (denying motion to dismiss unjust enrichment claims pleaded under the laws of 50 states).

The defendant also questions the assertion that some benefit was conferred on the defendant when the plaintiffs visited dealers to receive a free post-recall software fix for their cars that installed an "auto park" feature. However, that plainly is not the only—or even the predominant—benefit conferred that the plaintiffs have alleged. As noted above, their claims also are supported by the allegation that a benefit was conferred in the form of the inflated purchase price paid for defective and unsafe vehicles that were worth much less.

The defendant also contends that the claims by claims by Massachusetts plaintiff Hartt (Count XXIII), New York plaintiffs Lynd and Mack (Count LIII), Pennsylvania plaintiffs Weber and Vosburgh (Count LXXII), and Wisconsin plaintiff Marc Hughes (Count LXXXVI) all are barred as a matter of law because the plaintiffs affirmatively allege that they were indirect purchasers and bought their cars from third-party dealers, not directly from the defendant. However, district courts in this circuit in multidistrict actions have repeatedly rejected that argument when raised by defendants under the authority of various state laws. *In re Auto. Parts Antitrust Litig.*, 50 F.Supp.3d 869, 897 (E.D. Mich. 2014) ("[A]s indirect purchasers, any benefit conferred by the IPPs was to others in the chain of distribution, not Defendants, and the parties dispute whether the lack of direct contact dooms the unjust enrichment claims. The Court holds that it does not.") (applying the law of various states, including New York); *In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d at 671 (E.D. Mich. 2000) ("Whether or not the benefit is directly conferred on the defendant is not the critical inquiry; rather, the plaintiff must show that his detriment and the defendant's benefit are related and flow from the challenged conduct.").

There is no basis at this stage of the case to dismiss the unjust enrichment claims.

C. Express Warranty (U.C.C. § 2–313)

The defendant argues that all of the express warranty claims fail because the plaintiffs rely on the "New Vehicle Limited Warranty" that covered their vehicles, but they have failed to identify any "item" on the vehicles that was defective and needed repair. The New Vehicle Warranty "covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The basis of the defendant's argument is the flawed premise that the

only alleged " 'defect' is the absence of an 'item,' i.e., an auto-park feature," and "the auto-park feature was not an 'item on [the] vehicle[s] when it left the manufacturing plant.' " The defendant also contends that nothing in the FACMC plausibly suggests that the monostable shifter is defective.

Chrysler also argues that the laws of every state other than New York that are implicated by the express warranty claims require that the plaintiffs provide pre-suit notice directly to the defendant of the alleged breach before filing suit, and the few plaintiffs who allege that they provided a pre-suit notice (California plaintiffs Goldsmith, Nathan, and Pietri), do not allege any details of when or how that notice was provided.

### 1. Product Defect

▮▮▮▮▮ Looking to the allegations, discussed in detail above, describing the allegedly random and unreliable behavior of the monostable shifter, it is readily apparent that the plaintiffs here have alleged sufficiently that there is an "item" on their vehicles that is defective in "workmanship" or "materials," and that the defendant has failed or refused to fix it. The Pennsylvania enactment of U.C.C. § 2–313 is typical of this uniformly adopted statute and states that "an express warranty [is] '(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. (2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.' " *Allen–Myland, Inc. v. Garmin Int'l, Inc.*, 140 A.3d 677, 692–93 (Pa. Super. 2016) (quoting 13 Pa. Stat. § 2313). There is no dispute here that the New Vehicle Limited Warranty, delivered in writing to the plaintiffs upon their purchases of class vehicles, contains a "promise made by the seller to the buyer," whereby the defendant assured buyers that it would "cover[ ] the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." "A written express warranty that is part of the sales contract is the seller's promise which relates to goods, and it is part of the basis of the bargain." *Samuel–Bassett v. Kia Motors Am., Inc.*, 412, 613 Pa. 371, 34 A.3d 1, 25 (2011) (citing 13 Pa. Stat. § 2313(a)(1)). "To prevail on [a] breach of express warranty claim [the plaintiff must] establish that [the defendant] breached or failed to meet its warranty promise ..., that the breach was the proximate cause of the harm [to the plaintiff], and the amount of the ensuing damages." 34 A.3d at 35. Here, the plaintiffs have alleged that the defendant failed or refused to repair the defective gear shifter on their vehicles, and that they have been damaged by the loss of value of those vehicles owing to their unsafe and dangerous condition, which is as yet unremedied.

The defendant contends that because the only alleged " 'defect' is the absence of an 'item,' i.e., an auto-park feature," and "the auto-park feature was not an 'item on [the] vehicle[s] when it left the manufacturing plant,' " the New Vehicle Limited Warranty "simply does not apply" and does not offer any promise of repair that the defendant could have breached. The defendant also contends that nothing in the FACMC plausibly suggests that the monostable shifter is defective. But those arguments are flawed because they are based on a mischaracterization of the allegations in the FACMC, as discussed in detail above. The plaintiffs have alleged that something much more is wrong with their cars than the absence of an "auto park" feature. Moreover, the plaintiffs allege that the gear shifter remains defec-

tive and unreliable even after the "auto park" remedy was applied, and that there are recurring situations in which the unreliable gear selector continues to pose a serious risk of uncontrolled vehicle rollaways, with or without that fix.

The defendant also insists that the complaint, in "scattered conclusory allegations, [alleges only] that the monostable shifter, itself, has some undefined design defect," and that "it is axiomatic that express warranties covering defects in 'material' and 'workmanship,' like those at issue here, do not cover design defects." The defendant correctly points out that it is widely held that a written express warranty covering defects in "materials" and "workmanship" does not extend to "design defects." *E.g., Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1224 (9th Cir. 2015) (collecting cases) (holding that warranty against defects in "materials" or "workmanship" could be read to exclude "design defects," but was ambiguous because it also referred separately to "defects" introduced during the "design process," and therefore must be construed against the drafter and held to embrace "design defects" as well as "manufacturing defects").

However, notwithstanding its assessment of the law, the premise of the defendant's argument on this point is false, and dismissal is not warranted on the basis that the FACMC contains an insufficient or inscrutable description of the alleged defect. The FACMC alleges in quite specific terms that the gear shift mechanism violates recognized basic design guidelines for vehicle controls, that it offers insufficient and unreliable information to drivers about the gear that has been selected, or whether an intended gear selection was made, *and* that it spontaneously shifts from one gear to another. Those allegations, which include the inability of the gear shifter to maintain a gear setting once selected, adequately suggest that the

shifter is, in addition to being poorly designed, also poorly constructed or installed, with the result that it does not, in fact, "stay in 'Park' when placed in 'Park,'" even if, as the defendant insists, it was designed to do so.

At this early stage of the case, without the benefit of any factual development as to the cause and origin of the alleged defect, dismissal of the express warranty claims is not justified by a premature and uninformed classification of the alleged defect as being categorically in the realm of "design" or "manufacturing." As one district court recently observed, when confronting allegations of defective behavior of the operating controls on the defendant's stoves:

> At the pleading stage, ... where the distinction between a defect in design and defect in materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives. It is unclear what may have caused the alleged Surface Knob and Ignition System Defects; a fortiori, it is not clear whether (assuming they exist) they should be classified as design defects or defects in materials or workmanship. Such issues must await factual development.

*Volin v. Gen. Elec. Co.*, 189 F.Supp.3d 411, 421 (D.N.J. 2016).

### 2. Pre–Suit Notice

██ Pennsylvania's version of U.C.C. § 2–607, which is typical of language of this uniform provision, states in relevant part as follows: "Where a tender has been accepted ..., the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any reme-

dy." 13 Pa. Stat. § 2607(c)(1). Contrary to the defendant's position, the statute conspicuously does not state that it operates as a bar to *suit*, only to *recovery*. In other words, the notice requirement does not create a precondition to commencing a lawsuit.

Moreover, under the laws of most of the states mentioned in the express warranty claims in the FACMC, the courts have construed section 2–607 to permit the required "notice" to be given by the filing of a civil complaint, at least where suit is commenced "within a reasonable time." Even those states that have construed this section most strictly have focused almost exclusively on the timeliness of the suit; none have held that failure to serve some form of notice before filing suit is a bar to litigation. The New York Superior Court explained, for instance, that in normal commercial transactions, a seller has the right to believe all is well, "and it is the buyer's duty to inform him otherwise or waive his objections." *Mid Island LP v. Hess Corp.*, 41 Misc.3d 1237(A), 983 N.Y.S.2d 204 (N.Y. Sup. 2013). To that end, however,

> [t]imely commencing litigation through a formal complaint would obviously accomplish this task. Various ancillary virtues have been attributed to the 2–607 notice, such as affording the seller the opportunity to investigate the claim while the facts are fresh, take whatever steps it deems necessary to defend itself or offer a cure or remedy. However, the mere fact that the buyer has chosen to drag the seller into court in the first instance does not prevent the seller from doing any of these things; indeed, the normal rules of civil procedure are designed to accomplish exactly these tasks within the litigation process. The court notes, moreover, that in contrast to rejection (UCC 2–508), the seller has no right to cure accepted nonconforming goods. The UCC does not require pre-action media-

tion, and the court will not read Section 2–607 as creating such an obligation. *Ibid.* That court expressly recognized that the commencement of litigation, as long as it is within a reasonable time, adequately provides the notice required.

A federal court applying Pennsylvania law reached the same conclusion. *Bednarski v. Hideout Homes & Realty, Inc.*, 709 F.Supp. 90, 92 (M.D. Pa. 1988) ("Eaton argues that it did not receive any breach of warranty notice from Rooney. Rooney, however, contends that it provided notice to Eaton by filing its third-party complaint and that it is a question for the jury as to whether such notice was provided within a reasonable time. Based on the applicable authorities, the court agrees."). And the Missouri Supreme Court has explained: "The notice contemplated by the U.C.C. does not require any particular formality or detail as to the nature of the buyer's complaint. The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. U.C.C. (U.L.A.) § 2–607 Comment 4 (1989). In addition, the buyer is only under a duty to notify the immediate seller, not the manufacturer." *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 369 (Mo. 1993). Under Missouri law, the defendant is not entitled to any form of notice, since it does not claim to be the "seller" of the vehicles; in fact it specifically disclaims that role and insists that they all were bought from third parties, not from the defendant directly.

The decisions in Wisconsin do not elaborate on this point, but there the focus of all the holdings has been on the timeliness of the notice; no authority from that state has held that the absence of pre-suit notice is a bar to litigation. The Wisconsin Court of Appeals explained that the purpose of section 2–607 is to ensure that the plaintiff gives notice of a breach while a reasonable

chance for a cure remains: "Timely notice would have given Tuxen the opportunity to replace the diseased animals or take other steps intended to limit those collateral consequences. Whether Tuxen would have availed himself of that opportunity—or whether a solution would actually have been reached—is beside the point. Wisconsin Stat. § 402.607 required a notice of breach when a business solution to this problem was most likely to still be available." *Wilson v. Tuxen*, 312 Wis.2d 705, 754 N.W.2d 220, 233 (Wis. App. 2008).

Here, the defendant has not pointed to any pleaded fact that shows that it has been deprived of a commercially reasonable opportunity to resolve the plaintiffs' claims of breach by any delay in the filing of this case, and the pendency of the litigation certainly does not foreclose any further timely efforts to cure. There is no basis to find that the express warranty claims are defectively pleaded for want of reasonable notice.

### D. Implied Warranty (U.C.C. § 2–314)

#### 1. Fitness for Purpose

The defendant argues that the implied warranty claims all are fatally defective because the plaintiffs have failed plausibly to allege that their cars are unfit for the ordinary purpose of providing transportation. Chrysler bases that argument on the contention that if a driver puts the car in "Park" before exiting, "there will be absolutely no problem at all." As the defendant reads the FACMC, "most Plaintiffs do not allege that they have ever had, or that they even anticipate having, any problem with the monostable shifter." Def.'s Mot. at 41.

The elements of an implied warranty claim among the several states are quite similar, as one might expect with a uniform statute, and are summarized here.

- *California—Uniform Commercial Code (Cal. Com. Code § 2314)* (Count IX)

◼ "[California] Commercial Code section 2314 provides that a 'warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.'" *Arriaga v. CitiCapital Commercial Corp.*, 167 Cal.App.4th 1527, 1542, 85 Cal. Rptr.3d 143 (2008). "The implied warranty of merchantability may be breached by a latent defect undiscoverable at the time of sale." *Mexia v. Rinker Boat Co.*, 174 Cal. App.4th 1297, 1304, 95 Cal.Rptr.3d 285 (2009). However, "[a]s a general rule, a cause of action for breach of implied [or express] warranty requires privity of contract; there is no privity between the original seller and a subsequent purchaser who is in no way a party to the original sale." *Jones v. ConocoPhillips*, 198 Cal.App.4th 1187, 1201, 130 Cal.Rptr.3d 571, 581–82 (2011); *see also Traxler v. PPG Indus., Inc.*, 158 F.Supp.3d 607, 620 (N.D. Ohio 2016) ("California [plaintiffs] cannot state a claim for implied warranty of merchantability absent privity of contract.").

- *California—Song–Beverly Consumer Warranty Act (Cal. Civ. Code §§ 1791.1 & 1792)* (Count XII)

"Under the Song–Beverly Act, there is an implied warranty of merchantability with respect to consumer goods that are sold (Cal. Civ. Code, § 1792), unless the goods are sold with an express disclaimer stating they are sold 'as is' or 'with all faults.'" *Jones v. Credit Auto Ctr., Inc.*, 237 Cal.App.4th Supp. 1, 8–9, 188 Cal. Rptr.3d 578 (Cal. App. Dep't Super. Ct. 2015) (citing Cal. Civ. Code § 1791.3). "The Song–Beverly Act's implied warranty of merchantability applies to new goods (Cal. Civ. Code § 1791(a)), and also used goods, so long as the used goods are purchased 'in a sale in which an express warranty is

given.'" *Ibid.* (quoting Cal. Civ. Code § 1795.5). "Pursuant to Civil Code section 1791.1, subdivision (a), the implied warranty of merchantability requires 'that the goods meet each of the following: (1) Pass without objection in the trade under the contract description. (2) Are fit for the ordinary purposes for which such goods are used. (3) Are adequately contained, packaged, and labeled. (4) Conform to the promises or affirmations of fact made on the container or label." *Ibid.* "The core test of merchantability is fitness for the ordinary purpose for which such goods are used." *Ibid.*

● *Missouri (Mo. Rev. Stat. § 400.2–314)* (Count XXXI)

 "To prove a claim for breach of implied warranty of merchantability in Missouri, a plaintiff must show: (1) that a merchant sold goods, (2) which were not 'merchantable' at the time of the sale, (3) injury and damages to the plaintiff or his property (4) which were caused proximately or in fact by the defective nature of the goods, and (5) notice to the seller of the injury." *Hope v. Nissan N. Am., Inc.,* 353 S.W.3d 68, 90 (Mo. App. 2011). "Most importantly, a plaintiff must prove that he or she was injured by the defective nature of the goods." *Ibid.* "It is well established that purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own." 353 S.W.3d at 87. "It is not enough to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that their product actually exhibited the alleged defect." *Ibid.*

● *Pennsylvania (13 Pa. Cons. Stat. § 2314)* (Count LXXI)

 Under Pennsylvania law, "[t]o prove a breach of the warranty of merchantability, a plaintiff must show that the equipment obtained from the supplier was defective." *Visual Communications, Inc. v. Konica Minolta Bus. Sols. U.S.A., Inc.,* 611 F.Supp.2d 465, 470 (E.D. Pa. 2009). "This requires showing (1) that the product malfunctioned; (2) that the plaintiff used the product as intended or reasonably expected by the manufacturer; and (3) the absence of other reasonable secondary causes." *Ibid.* "[C]ontract claims for breach of the implied warranty of merchantability and fitness for a particular purpose may also fall within the sphere of products liability actions." *Barton v. Lowe's Home Centers, Inc.,* 124 A.3d 349, 357 (Pa. Super 2015). "In cases involving a breach of the implied warranty of merchantability, any party injured by the defective product may sue any party in the distributive chain." *Ibid.* "Implied warranties are implied by law to protect buyers from loss where goods purchased are below commercial standards." *Ibid.* The concept of merchantability [requires] that [the goods are] free from significant defects, that they perform in the way that goods of that kind should perform." 124 A.3d at 357–58.

 The defendant contends that it is undisputed that the cars are "minimally fit for the ordinary purpose of providing basic transportation," *Haag v. Hyundai Motor Am.,* 969 F.Supp.2d 313, 317 (W.D.N.Y. 2013), that the only alleged "failure" of the vehicles to provide transportation would be the result of gross misuse of the cars by the plaintiffs, and that the alleged "failure" does not concern anything that happens during "transportation," but only a purported tendency of the cars to "roll away" after they are fully stopped and parked. However, those arguments are based on the same faulty reading of the FACMC that has adulterated its other arguments. As discussed at length in this opinion, the

FACMC actually alleges very different things.

Moreover, the decisions on point in implied warranty cases concerning defective cars have recognized that merchantability implies not only that a vehicle can provide transportation, but that it can do so in a reasonably safe and controlled manner. In order to plead a viable claim for breach of the implied warranty, the plaintiff must allege that the defect rendered the car "unfit for its intended purpose [by] compromis[ing] the vehicle's safety, render[ing] it inoperable, or drastically reduc[ing] its mileage range." *Troup v. Toyota Motor Corp.*, 545 Fed.Appx. 668, 669 (9th Cir. 2013). Here the allegations of the FACMC certainly suffice to suggest that the gear shifter defect seriously "compromised the safety" of the class vehicles, and that the defect has resulted in hundreds of accidents and injuries.

It is well recognized, both as a matter of law and common sense, that "a merchantable vehicle under the statute requires more than the mere capability of just getting from point A to point B." *Brand v. Hyundai Motor Am.*, 226 Cal.App.4th 1538, 173 Cal.Rptr.3d 454, 460 (2014). *Brand* involved a car whose sunroof opened and closed without driver input. The car certainly was capable of providing transportation. But the court also emphasized that "an important consideration under the implied warranty is consumer safety." *Ibid.* As the court explained, "[t]his minimum guarantee in the implied warranty of merchantability protects not only the vehicle purchaser, but other motorists, passengers, pedestrians, and the public generally." *Id.* at 461. Applying that rubric, the court agreed that "a vehicle sunroof that opens and closes on its own creates a substantial safety hazard." *Ibid.* The court concluded:

Hyundai contends Brand's safety argument is specious because if open sunroofs rendered cars unfit for their ordinary purpose, then no cars would have sunroofs. The contention is itself specious, however, because it ignores the element of surprise and lack of control that differentiate a properly working sunroof and one that, as Brand describes it, spontaneously creates a gaping, intermittent hole in [the] vehicle as [one is] driving down the road. In minimizing the sunroof problem, Hyundai implicitly maintains that its vehicle remained roadworthy in its present condition without any repairs. But a jury reasonably could agree Brand prudently turned the vehicle in immediately because it was not safe for him to continue driving it.

*Id.* at 460–61 (2014). In this case, as in *Brand*, the facts alleged in the FACMC would allow a jury reasonably to infer "a multitude of similar unsafe scenarios" that could result from the failure by a class vehicle to select an intended gear, and the "element of surprise and lack of control" that would result from spontaneous and undirected shifts by the vehicle from one gear into another.

### 2. Manifestation

The defendant argues that all of the implied warranty claims are barred because the New Vehicle Warranty states that all implied warranties are subject to the same time and mileage limitations as the express warranty, and none of the plaintiffs claim that the alleged defect "manifested" within the applicable limited warranty period. The defendant further contends that the implied warranty claims by California plaintiffs Goldsmith, Nathan, and Pietri (Counts IX and XII), Missouri plaintiff Brooks (Count XXXI), and Pennsylvania plaintiffs Weber and Vosburgh (Count LXXI) all are barred because under the laws of those states the plaintiff must show that the defect has "manifest-

ed," but "none of the Plaintiffs has actually experienced a rollaway incident," and they allege, at most, that their vehicles pose a "risk" of such incidents. The defendant contends, moreover, that even if rollaway incidents had occurred, the plaintiffs from those states would have to show that some injury resulted from the incident in order to recover.

The FACMC sets forth claims for breach of implied warranty under the law of four states: California (Goldsmith, Nathan, Pietri); Missouri (Brooks); Nebraska (Walker); and Pennsylvania (Weber and Vosburgh). Four of the individual plaintiffs allege that they had rollaway incidents with their own cars: Goldsmith, Nathan, Brooks, and Mack. Those allegations certainly suffice to show that the alleged defect "manifested" for those plaintiffs. Four other plaintiffs allege that they have had problems shifting the car into an intended gear: Hartt, Lynd, Weber, Vosburgh. FACMC ¶¶ 36, 38, 56, 75, 79. Those allegations also suffice to suggest that their cars "manifested" the alleged defect of unreliable gear selection. The plaintiffs also assert that all of their cars are from model years 2014 and later, which it is undisputed were not sold earlier than the second half of 2013, and the first complaint was filed in this litigation in June 2016, which means that all of the alleged problems encountered by the plaintiffs necessarily must have occurred in cars that were bought and owned within the three-year limited warranty period, and the occurrence of problems therefore must have happened while the warranty was in effect.

With the exception of California plaintiff Pietri, all of the plaintiffs who pleaded implied warranty claims adequately have asserted that the alleged defect manifested for them during the limited warranty period. Nebraska plaintiff Walker's claims are subject to dismissal for separate reasons (see below). All of the other plaintiffs who

pleaded implied warranty claims adequately have asserted that the alleged defect manifested for them during the limited warranty period, and their claims are not subject to dismissal on that basis. Plaintiff Pietri's claims in Count XII will be dismissed because he did not allege any manifestation of the alleged defect.

### 3. Privity

▬▬ The defendant argues that the implied warranty claims by California plaintiffs Goldsmith, Nathan, and Pietri are defective as a matter of law because the plaintiffs allege that they bought their vehicles from third-party dealers, and California law bars any implied warranty claim where the plaintiff is not in privity with the defendant. The defendant correctly states the law as held by the published authorities on point in California with respect to the claim under Cal. Civ. Code § 2314: " 'Under California Commercial Code section 2314 ... a plaintiff asserting breach of warranty claims must stand in vertical contractual privity with the defendant. A buyer and seller stand in privity if they are in adjoining links of the distribution chain.' " *Mega RV Corp. v. HWH Corp.*, 225 Cal.App.4th 1318, 1333, 170 Cal. Rptr.3d 861 (2014) (quoting *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008)). The U.C.C. claim (Count IX) therefore is subject to dismissal, because none of the California plaintiffs allege that they bought their cars directly from the defendant. The plaintiffs also pleaded an implied warranty claim under the Song–Beverly Consumer Warranty Act, which the defendant does not seek to dismiss on this basis, and it is well accepted in California that, "under the Song–Beverly Act, [privity is] not require[d]." *In re Seagate Tech. LLC Litig.*, 233 F.Supp.3d 776, 786 (N.D. Cal. 2017) (citing Cal. Civ. Code § 1792).

### 4. Pre–Suit Notice

The defendant argues that the implied warranty claims are subject to dismissal based on the same notice provision (U.C.C. § 2–607) that it relies upon with respect to the express warranty claims. For the same reasons discussed above, its arguments are unavailing as to the implied warranty claims as well.

### E. Magnuson–Moss Warranty Act

The defendant contends that, because all of the express and implied warranty claims under state law are defective, the Magnuson–Moss Warranty Act claim likewise must be dismissed, because liability under the Act is derivative of those state law rights.

█ "The Magnuson–Moss Warranty Act provides a federal cause of action for a 'consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation ... under a written warranty [or] implied warranty.'" *Bennett v. CMH Homes, Inc.*, 770 F.3d 511, 512 n.1 (6th Cir. 2014) (quoting 15 U.S.C. § 2310(d)). "Under the Act, a 'consumer' is defined as 'a buyer ... of any consumer product.'" *Ibid.* (quoting 15 U.S.C. § 2301(3)). "The Act defines a 'consumer product' as 'any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes,' including attachments to real property but excluding real property." *Ibid.* (quoting 15 U.S.C. § 2301(1)). "Claims under the Magnuson–Moss Warranty Act 'stand or fall with ... express and implied warranty claims under state law.'" *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1227 (9th Cir. 2015) (quoting *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008)); *see also Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1231 (11th Cir. 2016) ("The claims under the Magnuson–Moss Act are identical to the other warranty claims noted because they are also based on state law.").

With the exceptions noted above, the plaintiffs adequately have made out their claims for breaches of express and implied warranties under state law, and their claims under the Magnuson–Moss Warranty Act, which "stand or fall" with the state law claims, therefore also are viable.

### F. Statute of Limitations

The defendant argues that Pennsylvania plaintiff Weber's fraudulent concealment claim is barred under the applicable statute of limitations, which is two years. *See* 42 Pa. Stat. § 5524(7). Weber alleged that he bought his car on September 9, 2013, and he did not file his complaint until July 8, 2016. The plaintiffs argue that the statute of limitations bar is an affirmative defense not amenable to adjudication under Rule 12(b)(6), and the discovery rule tolled the statute.

Under Pennsylvania law, if "through fraud or concealment the defendant causes the plaintiff to relax his or her vigilance or deviate from his or her right of inquiry, the defendant is estopped from invoking the bar of the statute of limitations." *Deek Inv., L.P. v. Murray*, 157 A.3d 491, 497 (Pa. Super. 2017). Here, the plaintiffs plainly allege that the defendant concealed the gear shifter defect until at least April 22, 2016, which is well within the two-year limitations period.

█ Moreover, as the plaintiffs point out, the statute of limitations is an affirmative defense that must be pleaded and proven by the defendant, not the plaintiff. Therefore, unless that defense is apparent from the complaint's allegations, it is not properly the subject of a motion to dismiss under Rule 12(b)(6), where the Court is confined to considering the facts alleged within the four corners of the complaint. This is particularly true where there are

disputed questions as to whether fraudulent concealment may toll the applicable limitations:

> [C]ourts should not dismiss complaints on statute-of-limitations grounds when there are disputed factual questions relating to the accrual date. *Examples of such disputed factual questions include claims that the defendant fraudulently concealed facts, thereby preventing the plaintiff from learning of its injury,* and complex issues about whether information in the plaintiff's possession sufficed to alert it of the claim. But where one can determine from the face of the complaint that the statute of limitations has run, dismissal is appropriate.

*Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 464 (6th Cir. 2016) (citations omitted) (emphasis added). That principle certainly applies where, as here, the question whether the defendant fraudulently concealed the defect at issue will play as one of the central and dispositive factual issues in the entire litigation. Dismissal of plaintiff Weber's claims on the basis of the time bar would be inappropriate and premature at this stage of the case.

### G. Injury and Damages

The defendant contends that all of the claims raised in the FACMC require some proof of "injury" or "damages" if the plaintiffs are to prevail, but "no Plaintiff plausibly alleges that they suffered any injury or damage," the claims all are "based upon mere theoretical possibilities of injury and/or damages," and the "allegations of benefit-of-the-bargain damages are facially implausible because Plaintiffs admit that their vehicles were fixed for free, thereby giving them the exact bargain to which they claim to be entitled." Def.'s Mot. at 50.

As to most of the plaintiffs whose claims presently are pending in the FACMC, this argument is a dead letter. It is based on the same false premises discussed at length above, which are no more viable in support of this argument than they are under any of the other variations on that theme presented in this motion. All of the plaintiffs adequately have alleged that they were damaged as a result of buying cars with a dangerously unreliable gear shift design, which resulted in, *inter alia*, a loss of economic value of the cars at the time of purchase, along with other incidental and consequential losses based on the defendant's failed attempts to repair the defect. *See In re Toyota Motor Corp.*, 790 F.Supp.2d 1152, 1165 (C.D. Cal. 2011) ("[A]ll Plaintiffs suffered an economic loss at the time of purchase because they received a defective vehicle.... The economic loss was present from the beginning.").

However, the allegations of one of the plaintiffs—Walker, from Nebraska—are conspicuously lacking in any plausible factual basis to show that she has any live, cognizable claim under any of the various theories pleaded in the FACMC. Walker specifically alleged that she never owned a class vehicle, and the 2014 Charger that she leased was returned at the end of the lease term when she decided not to buy it; she does say, though, that she "had it repaired" at the dealership while it was under lease. FACMC ¶¶ 60–61. Nothing in those allegations suffices to suggest that Walker experienced any problems due to the alleged defect while she owned the car, or that she suffered any loss as a result of simply leasing a class vehicle and "having it repaired." Since she no longer owns or leases the vehicle, she also has no present interest in obtaining any repair or replacement. The Court will dismiss all of plaintiff Walker's claims raised in Counts XXXIV–XXXVIII of the FACMC. Since Walker is the only surviving plaintiff with any live claims under those counts, they may be dismissed in their entirety.

### III. Conclusion

For the reasons discussed above, the following counts and claims in the FACMC must be dismissed: (1) the statutory and common law fraud claims by California plaintiff Pietri under Counts VI–VIII, X, and XII; (2) the statutory and common law fraud claims by Missouri plaintiff Brooks (Counts XXIX and XXX, in their entirety); (3) the California plaintiffs' implied warranty claim under the U.C.C. (Cal. Civ. Code § 2314) (Count IX) (in its entirety); and (4) all of Nebraska plaintiff Walker's claims in Counts XXXIV–XXXVIII (in their entirety). Otherwise, the rest of the defendant's arguments for dismissal of the complaint are without merit.

Accordingly, it is **ORDERED** that the defendant's motion to dismiss for failure to state a claim [dkt. # 50, 96] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the statutory and common law fraud claims and the implied warranty claim by California plaintiff Pietri **ONLY** under Counts VI–VIII, X, and XII are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the statutory and common law fraud claims by Missouri plaintiff Brooks are **DISMISSED**, and Counts XXIX and XXX are **DISMISSED WITH PREJUDICE** in their entirety.

It is further **ORDERED** that the California plaintiffs' implied warranty claim under the U.C.C. (Cal. Civ. Code § 2314) (Count IX) are **DISMISSED WITH PREJUDICE** in their entirety.

It is further **ORDERED** that all of Nebraska plaintiff Walker's claims are **DISMISSED** and Counts XXXIV–XXXVIII are **DISMISSED WITH PREJUDICE** in their entirety.

It is further **ORDERED** that the defendant's motion is **DENIED** in all other respects.